UNION SWITCH & SIGNAL CO. v. HALL SWITCH & SIGNAL CO.

(District Court, D. Maine.   December 14, 1915.)

No. 726.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—ELECTRIC RAILWAY SIGNAL-
ING SYSTEM.

The Struble patent, No. 819,322, for an electric signaling system for
use on electric railways, in view of the prior art, and especially of the
Spang patent, No. 168,059, for an electrical railway signaling apparatus,
does not cover a broad or generic invention, but must be limited to the
specific construction shown.  As so construed, *held* not infringed.

In Equity.  Suit by the Union Switch & Signal Company against
the Hall Switch & Signal Company.  On final hearing.  Decree for de-
fendant.

Gifford & Bull and George E. Cruse, all of New York City, and
Benjamin Thompson, of Portland, Me., for complainant.

Kenyon & Kenyon and Richard Eyre, all of New York City, and
Thaxter & Holt, of Portland, Me., for defendant.

HALE, District Judge.  This is a suit to enjoin the infringement of
United States letters patent 819,322, issued May 1, 1906, to Jacob B.
Struble, for improvements in electric signaling.  At the opening of the
specification, the character of the invention is stated as follows:

The invention described herein relates to certain improvements in automatic
electric signals for electric railways, and has for its object the overcoming
the danger of a signal being operated by reason of leakage of the current em-
ployed in operating the cars or other foreign current and the improper ener-
gizing of the signal-controlling mechanism by such wild currents.

In general terms the invention consists in the employment of an alternating
current in the track circuits for energizing the translating device or relay
controlling the signal circuit, which is controlled by neutral and polarized
armatures of the track relay or relays.

The complainant alleges infringement of claims 4, 11, 12, 13, and 15,
namely:

4. In a signaling system, the combination of a closed track circuit, an alter-
nating current supply therefor, a signal, and means to control the operation
of said signal, said means responding to the absence or presence of the alter-
nating current in the track circuit and not responding to continuous or direct
currents traversing said track circuit in its control of the signal.

11. In a signaling system for use on railways employing an electric current
as a motive power and the track as a return for the electric current, the com-
bination of a circuit which includes portions of both rails, an alternating cur-
rent supply for such circuit, and a translating device responsive to the pres-
ence or absence in it of the alternating current in said track circuit to control
a signal and not responsive to the motive power current or continuous or
direct currents in said circuit in its control of a signal.

12. In a signaling system for use on railways employing a direct current
as a motive power and the track as a return for the direct current, the com-
bination of a circuit which includes portions of both rails, an alternating
current supply for such circuit, and a translating device responding to the
presence or absence in it of alternating current in said circuit in its control of a

signal and not responding to continuous or direct currents in said circuit in its control of a signal.

13. In a signaling system the combination of a track circuit, a constant source of alternating current supply therefor, a signal, and means to control the operation of said signal, said means responding to the absence or presence of the alternating current in the track circuit and not responding to continuous or direct currents traversing said track circuit in its control of the signal.

15. In a signaling system the combination of a closed track circuit, a constant source of alternating current supply therefor, a signal and means to control the operation of said signal, said means responding to the absence or presence of the alternating current in the track circuit, and not responding to continuous or direct currents traversing said track circuit when the signal is at "danger."

The complainant contends that, in these claims, Struble presents a generic invention; that he was the first to provide a system of electric block signaling suitable for use on electric railroads, a system in which interference between the signaling circuit and the power circuit was prevented, and that he did this by using a signal current different from the propulsion current; that he used a direct current for operating the car motors, and an alternating current for providing energy to the signal relays; that nothing in the prior art discloses such invention; and that hence the claims at issue show Struble to be the pioneer in this field. The defendant denies infringement, and says that these claims are invalid in view of the prior patented art, and because they are not pertinent to anything disclosed in the drawings and specification of the patent in suit; that they are invalid, also, because the system disclosed by them is inherently useless and inoperative.

1. Anticipation. The claims at issue present a combination of five elements, to wit:

1. A railway track divided into blocks.
2. A closed track circuit.
3. An alternating current supply therefor.
4. A signal.
5. Means responding to the absence or presence of the alternating current on the track circuit and not responding to continuous or direct currents traversing said track circuit in its control of the signal.

The defendant says that this combination is found broadly in prior patents, and was well known in the art. It therefore becomes necessary to consider first what is disclosed in the prior patented art. In March, 1875, Henry W. Spang, of Reading, Pa., applied for his patent, No. 168,059. At the outset of his specification, he says:

My invention relates to that class of electrical railway signaling apparatus, audible or visual, or both combined, which is operated in connection with the rails of an insulated section or sections of railway track, and in which the electric circuit or circuits which control the signaling apparatus can only be properly brought into action, and a safety signal given, when the opposite rails of the said insulated section or sections of track are not occupied or metallically connected, as by the wheels and axles of a locomotive or car.

It consists, first, in certain novel combinations and arrangements of the rails of an insulated section or sections of railway, one or more galvanic batteries or other sources of electricity, conductors, devices for changing, closing, and breaking circuit, and one or more signaling apparatus, audible or visual, or both combined, in which the safety signal is indicated by a series of movements of signal, or series of bell taps, or other series of signs or sounds, or

by a single movement of signal, produced by, or dependent upon, a series of reverse currents of electricity, the whole being so arranged that said safety signal can only be given when the opposite rails of said insulated section or sections of track are not metallically connected, as by the wheels and axles of a locomotive or car, or are not occupied by means of a series of reverse or opposite currents passing over the entire length of said rails, and the conductors forming the circuit or circuits which control the signaling apparatus, and cannot be given by a single current passing over them, thereby preventing the liability of the safety signal being given by atmospheric electricity, such as produces lightning, aurora borealis, or earth currents, or by any other accidental current, and particularly when the rails of said section or sections are occupied by a locomotive or car; second, in certain novel combinations and arrangements of conductors and a galvanic battery, by which a series of opposite or reverse currents will be transmitted; third, in an improved semaphoric signal apparatus, in which a visual signal rotating or moving upon its center, or a shaft, in one direction, is in combination with a toothed wheel, an impelling escapement, and a lever which vibrates between the poles of an electro-magnet, when said magnet is alternately charged by a series of electric currents which alternately pass in opposite directions over the coils thereof; fourth, in a combination and arrangement of devices by means of which my invention may be used for the protection of two or more adjacent insulated sections of track at the same time, the combined length of said sections exceeding the length of railway rails over which the current of a single galvanic battery can be with certainty employed for signaling purposes.

Claim 1 presents a broad view of his invention.   It is:

1. The combination of one or more insulated sections of railway track, a main or primary battery and commutator, circuit changing relay magnets, and local or secondary batteries, an electric signaling apparatus, and intermediate conductors between the foregoing, arranged and operated for producing a series of signals in said signaling apparatus, or a single signal by a series of reverse currents, substantially as described.

The defendant contends: That Spang discloses broadly the inventive thought found in the combination of elements in the patent in suit. That he introduced to the art three ideas which are now found in the electric railway signaling art, namely: (1) The employment of alternating current in the track circuit with suitable distinguishing apparatus to prevent direct currents from clearing the signals; (2) the introduction of a normal danger system of signaling while maintaining the closed track circuit idea as the means for indicating the condition of the block to an oncoming train; and (3) the division of blocks into relayed sections to enable longer blocks to be employed without correspondingly increasing the voltage applied to the block. The standard block signaling system was not new with Spang. That system shows the track divided into blocks by insulation in the rails, each block having a source of current connected across one end, and a signal controlling device connected across the other end. This makes a closed track circuit, short-circuited by the wheels and axles of the train when it enters the block, thus shunting the current from the signal controlling device, and opening a local signal actuating circuit, allowing the signal to go to danger by gravity. This is the substantial system introduced by Robinson (1874), No. 5958 reissued patent. Robinson is called the "father of the system." It has been known by signaling engineers as the closed track circuit system, defined to consist of "a circuit that depends upon the continuity of the parts and the flow of cur-

rent to clear a signal." While Spang did not invent the automatic block signal of the closed circuit type, the proofs are convincing that he intended to make use of a completely closed track circuit, and that he employed the best appliances of his time. His specification, to which I have referred, shows that his primary thought was to prevent "the liability of the safety signal being given by atmospheric electricity, such as produces lightning, aurora borealis, or earth current, or any other accidental current." Such wild currents have been defined by Dr. Hering to be those that are not implicitly involved in operating. Dr. Robb speaks of these earth currents as being analogous to direct currents, and says that they should be treated as such. In his specification, Spang speaks of the liability of interruption by contact of conductors with another line which is apt to give a wrong signal and endanger the trains of a railway upon which the apparatus is used. He says:

> The object, therefore, of employing and depending upon a series of alternately opposite or reverse currents of electricity to pass over the said primary, or both primary and secondary circuits, and give a series of bell taps, or a series of movements of a semaphoric signal, or both, at regular intervals, to indicate safety, as hereinbefore described, is to prevent the liability of a safety signal being given by a current or currents of atmospheric electricity, or a current or currents from any other source than that regularly employed in connection with the rails and signaling apparatus.

Spang discloses signals of various kinds: A bell signal; a rotating disc signal; an electric lamp signal; and a form of semaphoric signal. It is clear, too, that he shows apparatus to control the signal, and that this apparatus was operated by an alternating or reverse current. His technical language was not the language of the later art; it has been characterized as "quaint" language. He referred to the current which he selected as a current having reversals in direction. He produced this current in one of two ways: First, by his commutator so connected to a battery and track that when the commutator is rotated there will be rapid alternations of direction of the current in the track rails. He produced a current, also, by a magneto inductor, which appears to have been the alternating current dynamo of that time, this dynamo having a permanent magnet, instead of an electro-magnet.

The proofs are clear, I think, that Spang provided distinguishing apparatus. He clearly had apparatus permitting the signal to be operated by alternating currents traversing the circuit, and for preventing the signal being operated by continuous or direct currents traversing the track circuit. He employed the distinguishing effects of an alternating and a direct current upon a polarized armature. I think the defendant is correct in saying that:

> Spang so designed his relay that its polarized armature would oscillate with the alternations of the current, and so applied the relay that only such oscillations would have any effect upon the signal.

Dr. Robb says that the distinguishing apparatus of Spang was the best apparatus of the day, and that it operated by an alternating current to clear a signal. He says, too, that late advancements in the art have been merely the substitutions of improved apparatus without

change of principle; that Spang achieved his results with mechanisms of the same general character as those employed in the later art. Dr. Robb alludes, also, to the Roome patent, 558,565 (1896), and the Shreuder patent, 566,541 (1896), and says that each discloses an alternating current, that both used neutral relays, and that any one who had installed a Roome or a Shreuder system, and had met with interference from stray direct currents, would at once think of the use of some sort of distinguishing apparatus. Alternating currents with distinguishing apparatus are found to be applied to electric railway currents in the Urquhart patent, No. 600,101 (1897). It is not necessary to refer in detail to other patents showing similar disclosures. Dr. Hering said that distinguishing apparatus and distinctive currents were the A B C of electrical engineering. In reference to distinctive currents and distinguishing apparatus Mr. Waterman said that:

Those facts have been known and widely known, known to everybody, for so long as I can remember; many, many years.

A study of the prior patents cannot·fail to lead the court to the conclusion that the distinctive current idea of means involving a distinguishing apparatus in its embodiment is found long before Struble's invention. Spang's prevailing idea of means was the requirement that, in order to give a clear signal, there should be a completely closed track circuit, and an alternating current flowing throughout that circuit. Spang did not have an electric railway before him; but clearly he was dealing with direct currents, with the same kind of currents to which Struble refers in the language which I have quoted from his specification. Spang seems to me to have had the inventive thought applicable as distinctly to an electric railway as to the direct currents with which he was dealing, and against which he provided. And so it cannot be said that any new problem arose later, when one of the two currents disclosed was an electric railway current; for there is no difference in principle between superimposing an alternating current upon an electric railway current, and superimposing an alternating current upon any other direct current. The principal attack made upon the Spang system by the complainant is that Spang did not disclose an always closed circuit. The closed circuit, as I have said, existed before Spang. Robinson shows it in his 1874 patent, No. 5,958 (reissue), to which I have referred. Let us see precisely what Robinson did. In his specification he says:

The invention consists, first, in a constant electric circuit for the purpose of operating electric railway signals, audible or visual; second, in a visual or semaphoric electric signal, in combination with a constant metallic circuit composed in part of a rail or rails of the track; third, in an alarm or audible signal, in combination with a constant metallic circuit consisting in part of a rail or rails of the track; fourth, in an additional or secondary circuit, in combination with a primary circuit composed in part of a rail or rails of the track; fifth, in a visual and audible signal, in combination with each other, and with a constant metallic circuit composed in part of a rail or rails of the track; sixth, in an electro-magnet and a battery so connected to the rails of a section of railroad track that when connection is established between said rails by the wheels and axles of a car, or by other superior conductor, the electric circuit is partially changed and the signal operated through the

demagnetization of the magnet; seventh, in an improved signal of very simple construction, whereby great ease of action is secured.

He says, too, that a constant circuit for railway signaling purposes is the chief feature of his invention; and he defines such constant circuit to be a circuit whose "magnet or magnets are operated or controlled without actually opening the circuit through said magnet or magnets." His broad idea is disclosed in claim 1:

The combination of a constant circuit, a magnet or magnets operated or controlled without actually opening the circuit of said magnets, and an electric railway signal or signals, substantially as described.

Spang adopted a device which he regarded as an improvement upon Robinson, namely, that of using a closed circuit only when a train was approaching. His purpose was economy. For such purpose, he says, he kept "the secondary or local signaling circuit open when not required to be brought into action to operate the signaling apparatus, and thereby prevent the waste and weakening of the batteries." The necessity of economy in those early days of the art is shown by Dr. Robb and other experts. In order to produce this result, Spang's original, crude method was by means of a commutator operated by a signalman. His principal and practical method was: When it was desired that the signal should be observed by an approaching train, he made the train automatically close the circuit. At other times the signal stood at danger; a train would not proceed until something affirmative was done to show the safety signal; and such showing could not be made until a closed circuit was established, and the flow of a definite kind of a current introduced into the circuit.

The sharp contention is made by the complainant that, in order to anticipate Struble, the closed track circuit must be always closed. The defendant contends that there is no functional difference between the operation of the always closed track circuit and the closed track circuit which is opened or de-energized when not needed, and that there is no difference whatever, so far as relates to the idea of supplying distinctive currents and distinguishing apparatus, to prevent direct currents from interfering with the signaling. Dr. Hering says that the idea of a closed circuit system does not involve the notion that the circuit must be closed all the time, day and night, trains or no trains; that there is no reason why the circuit should not be cut off and opened whenever there is no use for a signal. He says that the "constant" source referred to by Robinson, and insisted upon by the complainant, is a source that is constant while it is being used, and that it does not necessarily mean that the current is continuously flowing when not in use and when not required; that an electric railway has a closed circuit, even if that particular railway shuts down its power house each day in the morning, and at such time opens the circuit. By analogy, he urges that a waterfall is a waterfall, even if water is artificially diverted to a pond for a part of the time; that a shower bath is a shower bath, whether one starts it, either by hand, or by stepping upon a platform, as one approaches it; and that it makes no difference whether it is allowed to run all the time, or a

part of the time. I asked Mr. Waterman, the expert who testified in behalf of the complainant, to state fully the functional difference between an always closed circuit and a circuit closed only when needed. He put his objection substantially upon the fact that there is no time but that some exigency of the traffic may arise which will make the need for a track circuit, not only closed, but continuously energized. He discusses the figure of Spang's patent, in which the signalman is required, and supposes that the signalman turns the crank and signals the train to go ahead, and goes back to his newspaper. The substance of his complaint of the system is that in his opinion the only way to guard against accident is to have the track circuit always closed; but he points out nothing definite and distinct which, I think, is inconsistent with the defendant's contention that Spang's circuit is a closed circuit, even though it is purposely opened when not needed for a signal. Upon carefully examining the proofs on this subject, I cannot believe there is any functional advantage in the always closed track circuit over a closed track circuit provided with means to cut it open until a train approaches. It clearly did not involve invention for Spang to take the always closed circuit which he had before him in the prior art, and to put upon it what he regarded as the economical improvement of a circuit closed whenever required to be closed—if that had been all which Spang did. It seems equally clear that a change from Spang's circuit to a circuit always closed, and always energized, was a change that any one skilled in the art could have made without involving any use of the inventive faculties. Much of the comment upon Spang's system as disclosed by his patent comes from the fact that in 1875 all the apparatus known to the art of railway signaling was crude.

The complainant makes the sharp contention that Spang's patent was absolutely inoperative and unusable. I cannot conclude that the proofs sustain this contention. A working structure illustrating the Spang system was shown to me in the courthouse at the time of the hearing. Although this was subject to the attacks of learned counsel for the complainant as not presenting the Spang invention at all, it seemed to me to present the Spang system, and to illustrate the Spang patent as an operative and workable patent, as it was said to be by the experts on behalf of the defendant. A model also of the Orcutt patent was constructed and was explained to the court at the time of the hearing. This patent, No. 664,819, in its essential disclosure, is so similar to the Spang patent that I need not discuss it.

In considering the question of anticipation, it may be helpful to examine the broad character of the several claims at issue, and to make some comparison. Claim 4 is directed to apparatus for any signaling system employing track circuits. Spang's inventive thought was directed to substantially the same end. It cannot be said that the elements of an electric railway can be read into claim 4, though claims, not now at issue in the patent, include this element. It seems clear, too, as I have pointed out, that even though this element could be read into the claim, there would be no inventive thought disclosed in applying an old signaling system, without change, to an electric

railway, if such old signaling system was found to be applicable and useful on an electric railway. Claim 4 calls also for an alternating current supply for the track circuit. Spang supplied this alternating current for substantially the same purpose. I have already referred to the signal of Spang. Claim 4 calls for means to control the operation of the signal, said means responding to the absence or presence of the alternating current in the track circuit, and not responding to continuous or direct currents traversing said track circuit in its control of the signal. I have already called attention to the means employed by Spang. Spang's relay and Struble's relay are not the same. Struble employed two conflicting armatures, and made use of the open circuit principle. Spang made the clearing of the signal dependent upon a vibration which could be produced only by an alternating current. Claims 11 and 12 do not describe a closed track circuit. The combination which is disclosed in these claims seems broadly to have been covered by Spang's disclosure; for, although these claims specify that the signal system is for use on electric railways, this can only mean that the system is suitable for use on an electric railway. Upon a careful study of Spang and Orcutt, I think it must be found that their systems were also suitable for use on an electric railway, although an electric railway in their day had not been thought of; for substantially the same problem was presented in applying an alternating current and distinguishing apparatus to the track of a direct current electric railway as in applying such current and such apparatus to any conductors carrying a direct current.

Claim 13 does not describe a closed track circuit. It describes an alternating current as a constant source. It cannot be said that "constant" must necessarily have the meaning of a source which is always in use. A source which is steady in purpose is not necessarily always in use; but even though always in use, in view of the prior art it cannot be said, as I have already pointed out, there was any invention in this element. Claim 15 is substantially like claim 4, except that it is limited to the "constant source of alternating current supply" for the track circuit, and the prevention of the return of the signal from its danger position of indication by direct currents.

Upon comparing the two patents, I am constrained to believe that Spang shows broadly and substantially the same combination which Struble has pointed out in the claims at issue of the patent at bar, and that in each element of the combination he has used the best instrumentalities of his day; just as Struble and the defendant have employed the instrumentalities of a later day, without changing the broad principles shown in prior patents. It is undoubtedly true that great difficulties and dangers must be met in operating cars propelled by electricity on a block or section of railroad having an electric signal current. These difficulties and dangers have been fully presented by learned counsel. But, upon a careful examination of Struble's specification and claims at issue, I am constrained to find that in them Struble did not undertake to deal with this broad problem, and did not disclose to the art anything which applies a remedy. I think the principles to be applied to this problem had already been disclosed in prior patents.

The proofs are persuasive that Struble was not the first to use a signal current different from the propulsion current; that he was not the first to use a direct current and an alternating current; that he was not the first to use distinguishing apparatus; that he was not the first to provide an electric block signaling system suitable for use upon electric roads:

After a careful study of the proofs and of the prior art, I cannot agree with the complainant that the claims at issue of the patent in suit can be sustained as disclosing a broadly novel idea. In the light of the prior patents, I must decide that the claims at issue cannot be held to involve a generic invention. They are so broad in language that, in view of prior patents, they must be pronounced invalid, unless restricted to the specific construction shown in the patent. This construction consists substantially of the system set out in the specification, namely, a system centering about a relay for polarized and neutral armatures.

In thus restricting the scope of the patent, I am not unmindful of the heed that should be given to the action of the Patent Office. The patent was before the Patent Office in interference with the Winsor patent. Without discussing the contents of the file wrapper, it is necessary to say only that in the first instance the examiner found the subject-matter of the interference met by Spang and Orcutt. An appeal was taken; the examiners in chief reversed the examiner. A different primary examiner then took charge of the application. This examiner agreed with the former examiner. Thereupon Struble took an appeal to the board of examiners. The board dismissed consideration of the question with the brief statement that the question had been reviewed on Struble's ex parte appeal, and that there were no new considerations to change their decision. At the same time with the appeal to the board, Struble filed an appeal to the Commissioner. The case was postponed by the Commissioner from time to time, but was finally heard. Before any further action was taken, the complainant got the title to the Winsor patent, and thus closed all contest. It is true that, where trained experts of the Patent Office have decided that what was done by the patentee rose to the dignity of an invention, such decision carries weight with a court. Beer v. Waldridge, 100 Fed. 465, 466, 40 C. C. A. 496. In the case before me, the record of the Patent Office, under all the circumstances shown in the proofs, should clearly be given no greater moral weight than the ordinary prima facie force to which it is entitled under the patent law. And it is clear that Patent Office proceedings do not relieve the court from the duty of carefully and patiently considering all questions of anticipation.

I am aware that the patent has received from a District Court a construction giving it a much wider scope than I am able to give it. The patent has been before the court in the Second district in New York in 1910. Union Switch & Signal Co. v. General Ry. Signal Co. (C. C.) 180 Fed. 456. In the case before Judge Ray, the complainant in this case sued the General Railway Signal Company, charging infringement of the patent in suit before me, and another Struble pat-

ent, No. 819,323. A cross-suit resulted; the General Railway Signal Company sued the railway using complainant's apparatus, and charged infringement of several patents to Young. There is no need of going into the details of the litigation. Judge Ray held that there was a generic invention, defined in the opinion as the distinctive current idea of means involving a distinguishing apparatus in its embodiment. This idea was held to be involved in the claims of both the two Struble patents then before the court; and no distinction was made between the two patents. They were treated as if involving the same invention. Judge Ray does not discuss the particular structure presented for consideration in the patent at bar. Some of his conclusions of fact clearly show that he had before him entirely different proofs from those in the record before me. Some of his conclusions would have been obviously impossible upon the proofs presented before me relating to the one patent upon which I am called to pass. I have alluded to his clear and able opinion, because I give it great deference, as I ought. But, of course, I can be governed only by the proofs in the hearing before me, occupying several weeks in time. In that hearing, I gave the broadest scope to the issues, and listened to the examination of some of the most learned and scientific men in the country, who testified as experts. After careful consideration, it is my duty to come to my own conclusions from the proofs before me. In Beach v. Hobbs (C. C.) 82 Fed. 916, Judge Putnam pointed out that new parties litigant are entitled to have facts carefully scrutinized, with a view to determine whether such facts present a different case from that adjudicated in the prior litigation; as, he says, was pointed out in Andrews v. Hovey, 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160, where the result is an illustration of the necessity of securing to new defendants all their rights as shown by the special facts exhibited by them, notwithstanding determination in prior litigation with reference to the same subject-matter. Learned counsel for complainant urge that the great use of alternating current track circuits in recent years tends to show that invention was exercised by Struble in the patent before me. This argument is useful in deciding a close case of invention. In Beer v. Waldridge, 100 Fed. 465, 40 C. C. A. 496, Judge Wallace points out that, in view of authorities like Krementz v. Cottle Co., 148 U. S. 556, 13 Sup. Ct. 719, 37 L. Ed. 558, the question whether or not a given improvement involves invention is one upon which judicial minds divide, sometimes even in very simple cases, and in close cases of that character evidence of the commercial value of the patented article may be often persuasive that the patent is valid. I think the case at bar is not such a case. It is true that after Struble's time there became great necessity for the application of alternating currents upon railroads. Dr. Robb, and other experts, refer to this fact. But the proofs do not tend to show great commercial success of the patent at bar; and in considering the questions I must, of course, look to this patent, and not to the general utility and success which the complainant may have found in other patents. In a recent case, Cadillac Motor Car Co. v. Austin, 225 Fed. 933, 990, —— C. C. A. ——, the Circuit Court of Appeals for the Sixth Circuit pass upon a case where a selection of ele-

ments from existing machines and putting them into a combination produced a new result from a practical and commercial aspect; and the court predicated invention upon that fact, citing Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177. A similar state of facts was presented in Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, —— C. C. A. ——. In the case before me, the proofs fail to show any practical and commercial aspect relating to this patent which aids the court in coming to a conclusion.

2. Has the defendant infringed the claims at issue of the patent in suit? In the specification, the inventor says that his—

invention consists in the employment of an alternating current in the track circuits for energizing the translating device, or relay, controlling the signal circuit which is controlled by neutral and polarized armatures of the track relay, or relays.

In the restricted scope which I have given the claims before me, the complainant must be held to the combination which Struble had in mind, and which can be no broader than the distinct elements of his original idea of means, as shown in this patent. The complainant is entitled, then, to the specific construction pointed out in the patent, namely:

Struble's means responding to the absence or presence of an alternating current in the track circuit, and not responding to continuous or direct currents traversing the track circuit in its control of the signal.

Struble's achievement in this patent must be judged by the combination he disclosed and upon which he made the relay illustrating his idea of means. His conception relates to what is done when a direct current is in the track circuit. In this patent he is not, of course, entitled to any result which he reached in another and later patent. In the claims at issue of the patent at bar, his idea was to employ a polarized armature as an addition to the neutral armature, the ordinary relay of the signaling art; this additional piece of apparatus, namely, the polarized armature, when acted upon by a direct current, was to perform the additional function of breaking the signal circuit at a second point, to compel the signal to show danger, irrespective of traffic conditions. The inventor's idea was to accept the effect of the direct current on the neutral armature, and then to make an independent break in the signal circuit by a direct current, acting positively and reversely on the polarized armature, which was so conditioned as to be wholly nonresponsive to an alternating current. Nothing in his specification, or in the claims at issue, induces me to believe that Struble had, or thought he had, any inventive conception so broad as is attributed to him by the learned counsel for the complainant. From what has been said in discussing anticipation, it is clear, I think, that nothing in these claims before me teaches how to take the well-known system of signaling by alternating currents and to apply it to electric roads. As I have said, the principles involving this problem had already been taught in prior patents. Upon all the proofs, the court would not be justified, I think, in giving to the claims at issue

in the patent at bar the broad monopoly contended for by the complainant.

The defendant also is entitled, I think, to be protected in the disclosure made in its relay. That disclosure is essentially different from Struble's; it differs somewhat from Spang's. It is built on the inductive principle. It gets no effect from the direct current. The defendant eliminated the neutral armature, and substituted one responsive to alternating currents, but not responsive to direct currents. The defendant's combination shows means different in principle and in function from that of the complainant in this patent. I must, therefore, hold that the defendant does not infringe the claims at issue of the patent in suit.

The case has been an absorbing one, involving the labor for many weeks of eminent counsel, and of many witnesses. I found much interest in interrogating the experts and other witnesses, and in bringing out every possible illustration or suggestion that could aid in considering questions of great interest.

The complainant's bill is dismissed.

Let a decree be presented dismissing the bill.

Defendant recovers costs.

Defendant to present draft decree not later than December 22d. Complainant to present corrected decree, if any, not later than December 28th, at 10 o'clock a. m. Decree to be settled December 30th, at 10 o'clock a. m.