### LUDWIGS v. PAYSON MFG. CO.

### PAYSON MFG. CO. v. LUDWIGS.

(Circuit Court of Appeals, Seventh Circuit. April 15, 1913.)

Nos. 1937, 1938.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SASH-LOCK.

The Payson patent, No. 623,620, for a sash-lock, was not anticipated and discloses invention; also *held* infringed.

2. COURTS (§ 263*)—JURISDICTION—INFRINGEMENT OF PATENT—INCIDENTAL UNFAIR COMPETITION.

Where, in a suit in equity for infringement, the evidence which proves infringement also establishes that defendant made the infringing article in imitation of the patented device in form and appearance, such imitation, while constituting unfair competition, is in a fairer aspect an aggravation of the infringement, and damages therefor are recoverable in the same suit, regardless of the citizenship of the parties.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 799, 800; Dec. Dig. § 263.*

Jurisdiction of federal courts in suits relating to patents, see note to Bailey v. Mosher, 11 C. C. A. 313.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Kenesaw M. Landis, Judge.

Suit in equity by the Payson Manufacturing Company against William A. Ludwigs. From the decree, both parties appeal. Reversed in part, and modified in part.

Payson Company, an Illinois corporation, is the owner of patent No. 623,620, issued on April 25, 1899, to Joseph R. Payson, for a sash-lock. "Incidentally,"

the patent states, "the invention aims to cheapen the manufacture, and bring the lock into compact and ornamental shape or form." Payson Company has built up a large trade in this lock, particularly for use in buildings, like schoolhouses, where the lock cannot be reached from the floor except by the use of a window pole; has embodied the mechanical principles of the invention in the "ornamental shape" pictured in the drawings of the patent; and, to identify its product, has stamped the word "Payson" on the locks.

Ludwigs, a citizen of Illinois, is a dealer in hardware. For a time he filled his orders for Payson locks by purchasing genuine ones from Payson Company. Later he procured a brass-founder to cast for him spurious ones by using the genuine as a pattern. Material, color, form, and marks of the genuine were reproduced in the spurious. Thereafter Ludwigs filled orders by mixing a few genuine with many spurious which he passed off as genuine.

Payson Company's bill set up the patent and Ludwigs' sales, and charged that the sales infringed trade as well as patent rights. On pleadings and proofs the court decreed that the patent was void for lack of invention, but further decreed that Ludwigs be enjoined not only from selling or offering to sell the counterfeits, but also from making or using them, and ordered an accounting of Ludwigs' profits and Payson Company's damages by reason of Ludwigs' interference with Payson Company's exclusive right to make, use, and sell. Both parties have appealed, and the questions are the validity of the patent and the right to count on trade damages in a patent suit between citizens of the same state.

Drawings, description, and claims of the patent follow:

"My invention relates to certain improvements relating to a sash-lock adapted for use upon the meeting-rails of window-sashes and the like, the objects of the invention being to provide a lock that can be securely fastened by merely pulling forward a locking-arm without any secondary or additional movement or locking device, also one that can be unlocked by merely pushing backward said locking-arm, and also one that indicates at a glance by the appearance of the lock and the position of the parts thereof whether the sashes are locked or not.

"Incidentally, of course, the invention aims to cheapen the manufacture and bring the lock into compact and ornamental shape or form.

"To such end the invention consists in certain features of novelty and improvement which will be fully described and claimed in the following specification.

"The invention is illustrated in the drawings by means of five figures, of which—

"Figure 1 is a perspective of the preferred form of my improved sash-lock, showing the same in position upon portions of the meeting-rails of two window-sashes. Fig. 2 is a front elevation of the back plate of the lock and the parts connected therewith, showing said parts in the position assumed by them when the lock is unlocked. Fig. 3 is a vertical section in line $3$ $3$ of Fig. 2, showing the locking parts in their locked position and showing the front plate in co-operative relation thereto. Fig. 4 is a top plan of the front and back plates and a spring held in the back plate; and Fig. 5 is a view similar to Fig. 3, with the exceptions that the locking-arm is shown in side elevation and in a position intermediate between the locked and unlocked positions.

"In the drawings the meeting-rail of the lower sash is lettered $A$ and that of the upper sash $B$.

"$C$ is a plate adapted to be attached to the rail $A$ and commonly called the 'front' plate.

"$D$ is a plate adapted to be attached to the rail $B$ and commonly called the 'back' plate. Upon the rear portion of the front plate $C$ is a substantially vertical lug or flange $E$, approximately parallel with the meeting-rails, and upon the back plate are two vertical tongues or lugs $F$ $F'$, substantially at right angles to said meeting-rails and arranged parallel to each other and having their outer surfaces preferably in the planes of the opposite ends of the flange $E$. The tops and rear edges of the lugs $F$ $F'$ are joined by a curve substantially concentric about an axis indicated by pivot-holes $f$ $f'$ in the two lugs and a pivot $G$, secured in said holes. Upon this pivot is secured a swinging-arm $H$, extended into a segmental hook $h$, which terminates in a handle $h'$. The segmental hook has an internal curved surface substantially parallel with the pivot $G$ and preferably having a portion $h^2$ eccentric to said pivot and a portion $h^3$ concentric therewith. The portion $h^2$ diverges from said pivot toward the end of the hook, and the internal surface of the hook as a whole is intended to engage with the upper portion of the vertical flange $E$, the movement of the eccentric or camshaped portion $h^2$ over the top of the flange being adapted to draw the back plate upward and forward and the function of the concentric portion $h^3$ being to permit the final forward movement of the hook to be made without further motion of the meeting-rails. This is of double advantage. In the first place it removes any possibility of picking the lock or of its unlocking itself because of any jarring or shaking, however prolonged, and in the second place it makes the final forward movement of the handle easier than the prior movement, enabling the operator to tell readily when the sashes are securely locked.

"The top of the vertical flange $E$ is arranged as nearly as possible in the plane of the pivot $G$ and some little distance above said pivot, so that the upward movement of the lower sash or the downward movement of the upper sash cannot disengage the lock. As a result of this arrangement the insertion of a tool and the pressing upward with the same against the internal curved surface of the hook also has no tendency to unlock the swinging-arm. It is of course impossible to put the top of the vertical flange and the pivot in the same vertical plane, as in that case it would be impossible for the two sashes to be moved one past the other, which is often necessary in cleaning. The degree of approximation toward the same vertical plane is not material, except that it shall be sufficient to accomplish the result above referred to. This arrangement of the pivot and the point of engagement between the arm and the vertical flange does not interfere with the holding of the sashes against lateral movement with respect to each other, because such movement necessarily draws down the hook upon the flange, tending to crowd down the lower sash or crowd up the upper sash, which is not permitted by the window-frame.

"The pivoted end of the locking-arm is preferably squared about the pivot, so that the extreme end may have a horizontal under surface $h^4$ when the

sashes are locked and an adjacent surface $h^5$, which becomes substantially horizontal when the sashes are unlocked. In a suitable recess $b^2$ in the back plate a horizontal spring $I$ is placed, arranged to press upward upon the pivoted end of the locking-arm, thus tending to assist the final movement of said arm into either the locked or unlocked position and to hold said arm in either of said positions. A U-shaped spring is here shown held against horizontal movement between the two lugs $F$ $F'$, a flange $J$ rising from the rear of the bottom plate between said lugs, and two projections $K$ $K'$ upon the forward edge of the bottom plate and adjacent to the inner surfaces of said lugs. The spring $I$ is seen in Fig. 4. the upper portion being broken away to show the lower. Said lower portion has a tongue $i$ extending forward between the projections $K$ $K'$ to prevent the rear portion of the spring from being raised by the downward pressure of the locking-arm as the latter is swung forward or backward.

"The principal advantages of this sash-lock are its compact form, its neat and pleasing appearance, its great simplicity, making it easy and economical to manufacture and durable and not likely to get out of order when in use, and especially the great ease and simplicity of its operation and the evident and distinctive difference in the appearance of the lock in its locked and unlocked positions. To lock the parts, the lever is simply pulled forward, and to unlock the same it is thrown backward. In the locked position the lever as seen from the inside of the window lies within the outlines of the other portions of the lock and is not noticeable, whereas in the unlocked position it extends directly upward from the remainder of the lock and constitutes the most prominent feature thereof. It is practically impossible for any person, even if possessed of no mechanical talent whatever, to forget that when the lever is thrown backward and upward the lock is unlocked and that when it is thrown forward and downward the lock is locked. This makes it possible to determine at a glance whether the windows are fastened or not, which the average person cannot do if the only difference is caused by swinging the handle from right to left, or vice versa.

"It is obvious that the specific form, construction, and arrangement of the various parts of the lock may be varied greatly without departing from the essential features thereof, and I therefore desire not to limit myself to the preferred construction herein shown and described in any of these particulars.

"I claim as new and desire to secure by letters patent—

"1. A sash-lock having a back plate provided with a locking-arm pivoted near its front edge to swing forward in a plane substantially transverse to the meeting-rails of the sash, and a front plate provided with a vertical flange upon its rear edge extending upward to a point above and approximately in the vertical plane of the pivot when the arm is locked, said locking-arm being formed with a segmental hook having an under curve substantially parallel to its pivot and adapted to engage when locked with the top of the vertical flange; substantially as described.

"2. In a meeting-rail sash-lock the combination with a front plate having a vertical flange upon its rear edge, of a back plate having a locking-arm pivoted to swing forward in a plane substantially transverse to the meeting-rails and upon a pivot below and approximately in the vertical plane of the top of the flange upon the front plate, said locking arm being provided with a hook having an internal surface substantially parallel with the arm-pivot and curved in the plane of the arm's movement, the rear portion of said curved surface being substantially concentric with the arm-pivot and the forward portion being eccentric thereto and receding forwardly therefrom; substantially as described.

"3. The combination with the plate, $D$, having the swinging arm, $H$, provided with a squarred lower end pivoted to said plate near the front thereof, of the spring, $I$, bearing upon said squared surfaces alternately and held in a socket in the plate formed by vertical flanges or lugs thereupon on the sides and in the rear and by the lugs, $k$ $k'$, in front, said spring, being formed with a tongue, $i$, extending between said lugs $k$ $k'$, and giving a more forwardly-extending bearing for the spring upon said plate; substantially as described."

Frederick Benjamin and Benjamin T. Roodhouse, both of Chicago, Ill., for appellant.

George P. Barton and George E. Folk, both of Chicago, Ill., for appellee.

Before BAKER AND KOHLSAAT, Circuit Judges, and ANDERSON, District Judge.

BAKER, Circuit Judge (after stating the facts as above). [1] 1. Patents that show locking levers operable in a horizontal plane need not be reviewed, for if the Thompson British patent, No. 2060 of 1876, with a lever moving in a vertical plane, as does Payson's lever, neither anticipates the Payson combination nor teaches the mechanic how to modify and reconstruct the Thompson into the Payson device, certainly those others do not.

Thompson's figures 1 and 2 are here reproduced:

Fig.1          Fig.2

Construction and intended operation are thus described in the specification:

"I form the fastener in two parts, one of which is fixed to the lower bar of the upper sash, and the other to the upper bar of the lower sash, as heretofore. I form one part thereof with a hinged lever, the knuckle of which is formed with flat sides which by the aid of a spring d, act to keep the said lever either in a vertical or horizontal position. The outer end of the said lever is formed with a slot, c', which is so arranged as to permit a sliding catch, e, on the other part of the fastener to pass therethrough when the lever is pressed down into a horizontal position, then by sliding the said catch it is caused to pass over the metal at the end of the slot and thereby securely hold the two parts together. The lever is formed to act in combination with a projection or fulcrum on the other part of the fastener in such manner as to ensure the proper closing of the sashes by the simple depression of the lever. If desired the sliding catch may be made self-acting (by means of the spring, g) to lock the parts together."

It seems quite clear to us that Thompson had no conception of a device in which the pulling forward or pushing backward of a lever in a vertical plane would lock or unlock the sashes "without any secondary or additional movement, or locking device." He relied upon the lever and the opposing flange only to bring the sashes together laterally, and to his sliding catch he wholly ascribed the function of locking. So the Thompson patent is not an anticipation; and this virtually is confessed by Ludwigs' reliance on Thompson modified by omitting the catch.

But the modified Thompson structure is not a part of the prior art. Topliff v. Topliff, 145 U. S. 156, 161, 12 Sup. Ct. 825, 36 L. Ed. 658. It has been produced in the light of Payson's teachings. It is a sub-

sequent art brought into being in the endeavor to defeat Payson. If, however, the sliding catch be omitted, what results? A locking device in which the locking function is lost with the removal of the locking element. For a glance at the drawings will show, what was demonstrated by tests of the model in court, that the pivot on which the lever is hinged and the top of the opposing flange on which the lever bears are so nearly in a horizontal line that a slight effort is effective to throw off the lever and raise the sash; while in the Payson lock the lever and the opposing flange are designedly so formed, and the pivot and flange are so nearly in a vertical line, that the practical art has been given what Payson promised, "a lock that can be securely fastened by merely pulling forward a locking arm without any secondary or additional movement or locking device." If the mechanics of the case left any doubt, it should be resolved in favor of invention by reason of the lock's filling a special need, its success in commerce, the general acquiescence of the trade, and the tribute of Ludwigs' faithful imitation.

[2] 2. Counsel for Ludwigs cite several cases in support of their contention that under no circumstances can damages from unfair competition be lawfully included in patent litigation between citizens of the same state. Illinois Watch-Case Co. v. Elgin National Watch Co., 94 Fed. 667, 35 C. C. A. 237; Keasby & Mattison Co. v. Philip Carey Mfg. Co. (C. C.) 113 Fed. 432; King v. Inlander (C. C.) 133 Fed. 416; Cushman v. Atlantis Fountain Pen Co. (C. C.) 164 Fed. 94; Mecky v. Grabowski (C. C.) 177 Fed. 591; Johnston v. Brass Goods Mfg. Co. (D. C.) 201 Fed. 368. Whether or not such damages are cognizable if two separate and distinct matters or transactions are offered for investigation, or if, one matter alone being in evidence, the patent fails, we need not consider. For here the patent is found to be valid and infringed. Evidence of sales to prove infringement of the mechanical principles of the patent establishes also that Ludwigs unlawfully took the livery of Payson in order to make the sales. Under such circumstances (whether the compactness for cheapness of manufacture and the ornamental form are within the protection of the claims or not) a federal court of equity in granting relief for the infringement of the mechanism ought not to remit the complainant to another forum to mete out the damages which necessarily appear in proving the infringement and which, though in one aspect arising from fraud in trade, in a fairer aspect are aggravations of the infringement. Globe-Wernicke Co. v. Fred Macy Co. (C. C. A. 6th Circuit) 119 Fed. 696, 56 C. C. A. 304; Adam v. Folger (C. C. A. 7th Circuit) 120 Fed. 260, 56 C. C. A. 540; Woods Sons Co. v. Valley Iron Works (C. C.) 166 Fed. 770; Onondaga Indian Wigwam Co. v. Ka-Noo-No Indian Mfg. Co. (C. C.) 182 Fed. 832; Ross v. Geer Co. (C. C.) 188 Fed. 731; Saxlehner v. Eisner & Mendelsohn Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60; Siler v. Louisville, etc., R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753.

Consequently Ludwigs should respond fully for his wrongful conduct as shown in this record. In addition to being enjoined, he should be held to account, first, for the profits he has made by his infringe-

206 F.—5

ment; second, for any additional profits Payson Company would have made if it had filled the orders for which Ludwigs supplied spurious locks; and, third, for any further damage Payson Company may have suffered in reputation and loss of trade resulting from the appearance of the spurious goods in the market.

Though the decree as entered respecting unfair competition must be modified, it is evident that Ludwigs gains nothing by his appeal. So the costs thereof, as well as of Payson Company's appeal, should be taxed against him.

The decree is vacated and the cause remanded, with the direction to enter a decree in favor of Payson Company in consonance with this opinion.