KAWNEER MFG. CO. v. DETROIT SHOWCASE CO.

(District Court, E. D. Michigan, S. D.   February 28, 1917.)

No. 128.

1. PATENTS ⬅️328—VALIDITY AND INFRINGEMENT—STORE FRONT CONSTRUCTION.

   The Plym patent, No. 852,450, for a structure for holding heavy plate glass in position for store windows, *held* infringed.

2. PATENTS ⬅️234—INFRINGEMENT—IMPAIRMENT OF FUNCTIONS OF DEVICE.

   Infringement is not avoided by impairment of the functions of an element of a patented device in degree, if the distinguishing feature is retained.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370, 381.]

3. PATENTS ⬅️328—VALIDITY AND INFRINGEMENT—STORE FRONT CONSTRUCTION.

   The Plym patent, No. 860,150, for store front construction, *held* infringed.

4. PATENTS ⬅️236—INFRINGEMENT—UNITING TWO PARTS IN ONE.

   Infringement is not avoided by forming in one part two elements of a patented device, if the part thus formed secures the same results in substantially the same way as the two elements.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 372, 373.]

5. TRADE-MARKS AND TRADE-NAMES ⬅️70(1)—"UNFAIR COMPETITION."

   It is "unfair competition" to manufacture an article and sell it for resale to ordinary people, if it is so similar to the article made by a patentee or original manufacturer that the ordinary man who buys and uses it cannot tell it from the genuine, even though the actual sale to the jobber, wholesaler, or middleman is without misrepresentation.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81.

   For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

6. TRADE-MARKS AND TRADE-NAMES ⬅️70(1)—UNFAIR COMPETITION.

   A defendant *held* chargeable with unfair competition in constructing store fronts which were not only an infringement of complainant's patents, but were so like complainant's structures in appearance that the ordinary observer could not tell one from the other.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81.]

In Equity.   Suit by the Kawneer Manufacturing Company against the Detroit Showcase Company.   On final hearing.   Decree for complainant.

Wallace R. Lane and Clarence J. Loftus, both of Chicago, Ill., for plaintiff.

Edward N. Pagelsen, of Detroit, Mich., for defendant.

TUTTLE, District Judge.   In this suit the plaintiff charges three things against the defendant: Infringement of patent No. 852,450, to Plym, of May 7, 1907; infringement of patent No. 860,150, to Plym, of July 16, 1907; and unfair competition.

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The defendant admits the validity of the two patents and denies infringement. Defendant also admits that the structures manufactured and sold by it are of such similarity in appearance to plaintiff's structure that those not technically familiar with the articles would be confused as between the two, and would be likely to take one for the other. Defendant denies, however, that people skilled in the trade and in the art, and those engaged in dealing in and handling the articles would be deceived, and denies that the defendant has ever sold its articles for the articles of the plaintiff, or that it has ever deceived any one with whom they have dealt. I will take these matters up in the order that I have mentioned.

[1] As already stated, the validity of the patent to Plym, No. 852,-450, of May 7, 1907, is admitted; but proof has been offered by the defendant as to the state of the art and prior inventions for the purpose of limiting the scope of the patent, and as bearing upon the question of noninfringement. After hearing all of this proof, and considering all of these matters, the case, on that branch, narrows itself down to the single question as to whether the defendant's inner gutter is resilient, within the meaning of the patent—whether or not the defendant's inner gutter actually assists and serves, because of resiliency, in holding the glass. Does it press the glass yieldingly outward, so that, on pressure from the outside, it yields with sufficient resiliency, so that the glass is saved from breaking, and then, when the pressure is withdrawn, the glass is returned to its normal position, and the inner gutter assumes its normal position, because of resiliency?

Defendant denies that it possesses resiliency, contending that, while on heavy pressure, it will yield, and when the heavy pressure is withdrawn it will resume its normal position, yet denies that the possible forces applied to the glass before the breaking point is reached are such that resiliency of the inner member is brought into play. Results of an experiment were brought to my attention and offered in evidence by the defendant, for the purpose of showing that this inner member is not resilient. This experimental test is not persuasive, as it does not correctly represent the conditions existing in practical use.

In determining this question, of course, the court ought to have in mind the weight of the glass, the amount of pressure that is likely to be exerted against it, the bending qualities of the glass, and all of its different characteristics. Glass, while it can be bent, at the same time possesses great strength, and these large panes of glass are heavy, and must, if they are serviceable and durable, resist heavy strains. The resiliency which the patent intends for the inner member is not that kind of resiliency which is very easily yielding, or it would not serve its purpose. The value of the resilient inner member is to hold the glass in its normal position so much of the time as possible, and to only permit it to leave that normal position on heavy pressure, for the purpose of saving it from being broken.

· I have studied by actual experiment of my own the question of whether or not it was resilient. It yields perceptibly upon pressure. In addition to my own judgment upon that subject, I have had in mind the previous case from this court (Kawneer Manufacturing Company v. Toledo Plate & Window Glass Company [D. C.] 232 Fed. 362),

in which the Circuit Court of Appeals of this Circuit (Toledo Plate & Window Glass Co. v. Kawneer Manufacturing Co., 237 Fed. 364) has held a similar inner gutter to be a resilient member. I have not changed my own opinion with reference to the inner gutter of the Toledo Plate Glass Company, which I then thought was resilient. Every thought and every reason which would lead me to think that member resilient would lead me to believe that this one is. Within the proper construction and meaning of the language of the claims of the patent, the inner gutter is resilient.

[2] Defendant's inner gutter has no turned-down edge or lip which presses flatly against the glass on its inner surface. On the pressure from the outside I fail to discover any difference in the actual function of defendant's inner gutter and the same gutter with the flange extending downward and pressing flatly against the glass. I take it any such flange would only offer resistance and add to resiliency on pressure from the inside. On pressure from the inside it would press against this down-turned edge of the gutter, and the tendency would be to return the glass to its normal position. On pressure from the outside, as soon as the lower or extreme edge of the glass leaves the perpendicular, it would leave such a flange; and I fail to discover any force or any function that would be performed by the flange on the pressure from the outside. While the glass is to be protected and guarded against pressure from both sides, there is a greater occasion or reason for guarding against heavy pressure from the outside; therefore, if there is any difference, it is one of impairment of functions without changing the operation. "Infringement is not avoided by impairment of the functions of an element of a patented device in degree, if the distinguishing feature is retained." Penfield v. Chambers Bros. Co. (C. C. A. Sixth Circuit) 92 Fed. 630, 653, 34 C. C. A. 579; Murray v. Detroit Wire Spring Co. (C. C. A. Sixth Circuit) 206 Fed. 465, 124 C. C. A. 371, and cases there cited. Defendant's inner gutter is, in my opinion, resilient, and I hold it to be resilient. I hold claims 5, 6, and 7 of patent No. 852,450 infringed.

[3] Claims 1 and 2 of patent No. 860,150 are the ones in suit and read as follows:

"1. The combination of a channeled front plate, a back plate, a channeled filling strip occupying the channel of the front plate and headed fastening devices extending through the channeled plate and the back plate and having their heads within the channeled filling strip to be covered by the same.

"2. The combination of a channeled front plate provided with lateral flanges, a plate back of the same and provided with resilient wings, a stiffening part engaging the back plate, bolts extending through the channeled front plate, the back plate, and the stiffening part, and a channeled filling strip occupying and closing the channel of the front plate and clamped in position by said bolts."

Defendant, while admitting the validity of this patent, introduced a number of prior patents. The British patent to Shelley, No. 12,036 of 1887, is admitted by defendant's expert to be the nearest to both plaintiff's and defendant's constructions. This does not show a practical construction for store front purposes. This is admitted by defendant's expert. None of these prior patents show anything which limits either of these claims.

The defendant's structure has a front plate consisting of two glass engaging lateral flanges with inwardly extending members, with a channel between them to receive a channel filling strip. This filling strip is formed as a part of the inwardly extending members of the front plate. There is a back plate with lateral flanges for engaging the inner sides of the adjacent edges of the glass. Bolts, with heads fitted within and covered by the channel filling strip, are supported by the sides of the channels of the filling strip and front plate and pass through the back plate for adjusting the front plate and back plate relative to each other for properly holding the glass with a resilient friction grip.

The first claim contains four elements, three of which are admittedly old, and one, the channel filling strip occupying the channel of the front plate, is new. The second contains five elements, four of which are old, and the new one being the same new element as that in claim 1. Defendant contends that this new element, viz., the channel filling strip, is not found in its constructions, and that therefore neither of these claims was infringed by it.

The completed structures, as they are finally in service in the building, holding the two adjacent edges of adjacent panes of glass at the corner of a building, or in front of a building, after they are assembled and in place, are identical, except that the bottom part of the channel front plate of the plaintiff's structure is absent from the defendant's structure. Aside from this, in the finished form they are identical in shape, and where you find one thickness of the metal in one you will find one thickness of the metal in the other; and where you find two thicknesses of the metal in one you will find two thicknesses of the metal in the other. At the point where the head of the bolt exerts its pressure, it is identically the same part of the structure, and at that particular part there are two thicknesses of the metal immediately opposite, between the head and the glass in each structure.

Considering the finished structure, and forgetting for the instant the manner of assembling, it would seem to me that the two structures were identical in every particular, except that the defendant, by removing the bottom part of what the plaintiff calls the channeled front plate, has impaired to that extent the function which that plate is to perform. I am led somewhat to that conclusion (which seems to me apparent by looking at the structures and considering the results which they are intended to accomplish) by the fact that the defendant itself, in one of its structures, has arranged a tie across the bottom of this channel at the point where the head of the bolt comes in contact with the sides of the channel in order to prevent spreading of this channel. I would expect it to spread, and in actual use it evidently has on some occasions spread, or the defendant would not have found it necessary or desirable to use the tie or stay across the bottom. If that tie was extended along the entire length, then we would have the identical structures when they were in place and performing service, and then the only possible difference would be one of assembling. So it seems to me that either of the defendant's structures, when assembled and in service in the building, is in fact the plaintiff's structure, except for the impairment that I have mentioned. An infringer

cannot escape liability for his infringement by diminishing or impairing the advantages and functions of the patented device, if he retains the substantial form, function, and manner of operation.  See cases supra.

Now, is there enough of the assembling feature in the plaintiff's patent, and is there enough difference in the defendant's method of assembling, to avoid infringement?  I have already reached the conclusion, as stated, that in the finished product I find them the same.  If I read either claim 1 or claim 2 of the plaintiff's patent upon the structure when it is assembled and together, I read it as readily on the defendant's structure as I do on the plaintiff's structure.  And in my interpretation of it I am not at all bothered to do that by the fact that the bottom of the so-called channel or front strip of plaintiff's structure has been removed in the defendant's structure.

The plaintiff describes his method of assembling—talking about claim 1—by first putting together the three old elements, and then slipping the channel filling strip into its place under the heads of the bolts; the back plate and the so-called channeled front plate having first been bolted together.  In other words, the plaintiff assembles those old parts first, and then slips his new part into position under the head of the bolt.  In the actual structures made under the patent by plaintiff, the bolts are slid into the filling strip and then inserted directly through the channeled front plate, instead of sliding the filling strip over the bolt heads, and as thus assembled are delivered to the user.

The defendant, in assembling its structure, first makes into one piece that which corresponds to the channeled front plate and the channel filling strip of the plaintiff's structure, then slips the head of the bolt into the channel, and then fastens these three elements to the back plate.  In other words, as I view it in the combination, it is simply a difference in the order of assembling, and a difference in the part where the last step in the assembling takes place.  In the plaintiff's structure the last step is to put in the channel filling strip, and that completes the last step in the combination of the four elements; while in the defendant's structure the last step is to add to the other three elements the back plate.

[4] I find nothing in the patent in suit or in the prior art relied upon by the defendant, which so limits the plaintiff's claims that this difference in the method of assembling ought to avoid infringement, when the finished completed article, when assembled, is, as I find it to be, the same as plaintiff's structure, and possesses each and every one of the elements and functions of the plaintiff's structure and accomplishes the same result in precisely the same way.  Infringement is not avoided by the forming in one part two elements of a patented device, if the part thus formed secures the same results in substantially the same way as the two elements.  Bundy Mfg. Co. v. Detroit Time-Register Co. (C. C. A. 6th Cir.) 94 Fed. 524, 538, 36 C. C. A. 375;  Nathan v. Howard (C. C. A. 6th Cir.) 143 Fed. 889, 893, 75 C. C. A. 97;  Clipper Belt Lacer Co. v. E-W Co. et al. (C. C. A. 6th Cir.) 237 Fed. 602, —— C. C. A. ——;  Pedersen v. Dundon (C. C. A. 9th Cir.) 220 Fed. 309, 311, 136 C. C. A. 143, and cases there

cited. I have discussed this particularly with reference to claim 1, but everything that I have said with reference to claim 1, so far as really affecting or controlling this lawsuit, could be said with reference to claim 2, because claim 2 differs simply by having an added element, and that element is an old element, making a combination of four old elements, with one new element, viz., the channeled filling strip. The added old element in claim 2 is made by defendant and does not change the reasoning nor change the conclusion; so I hold that this patent, which is admittedly good, is broad enough, and that the defendant's structure is close enough, so that the defendant's structure infringes both claims of patent No. 860,150.

This leads me to the other and only remaining branch of the case —that of unfair competition. As I stated at the outset, it is proven beyond dispute, and in fact is admitted in the case, that the structure of defendant is so similar in appearance to that of the plaintiff that the unskilled, average, ordinary consumer, the man who ultimately gets the product, finally pays for it, and finally uses it and owns it, would not know the one from the other.

The record shows that the plaintiff had built up a large business in this country in these products. The structures covered by the two patents in suit are closely related to each other in a commercial way. The articles built under the one, and those built under the other, fit into the same structure, they adjoin each other in the structure, and they ought to be and are built in harmony with each other, and they are so sold and used. It is true, as has been urged by counsel, that the officers of the defendant company are men of high standing in this community, and I ought not to do, unnecessarily, any harm to their business, or to them as individuals, by any decision that I might make in this court. It is not for me to pass upon their individual intent in this matter, and I am glad that I am not called upon to do that, because, knowing some of them as I do, I know they would not intend to violate the law, or intentionally do what was wrong in any particular. Yet I find, according to my best judgment, that they have infringed both of these patents, and, as I say, it must be admitted on this record that the product which I find was an infringement of these patents is so like to that of the plaintiff's product made under these patents, and upon which plaintiff had built up a business and established a reputation, that it did in fact—whether the officers of defendant company as individuals intended that it should so result or not—deceive the public. It must be admitted that the ordinary layman, who owns a store and needs a new show window, might specify "Kawneer," receive defendant's structure, and think he was getting "Kawneer," and he never would know, unless some one told him, but that he had "Kawneer."

[5] When patents are infringed, and articles made that are so similar to the genuine article, the result to the plaintiff in truth and in fact must be held to be unfair competition. I find, as a matter of fact, that the defendant has not deceived any one that purchased direct from it. Every one who has bought from it has known what he was buying, and has known that he was buying defendant's

product, and not Kawneer product. I am satisfied that the defendant would not do so, and there is no proof that it has done so. On the other hand, there is proof that it has not; but I do not think that is the test. It would be unfair competition to do that. It is also unfair competition to manufacture a patented or unpatented article and sell it for resale to the ordinary purchaser, if it is so similar in all its details, functional and nonfunctional, essential and nonessential, to the article made by the patentee or original manufacturer, that the ordinary man who buys it and uses it cannot tell it from the genuine, even though the actual sale to the jobber, the wholesaler, or the middleman is without misrepresentation. Coca Cola Co. v. Gay-Ola Co. (C. C. A. 6th Cir.) 200 Fed. 720, 119 C. C. A. 164; Gaines v. Turner-Looker Co., 204 Fed. 553, 556, 123 C. C. A. 79; Enterprise Mfg. Co. v. Landers et al. (C. C. A. 2d Cir.) 131 Fed. 240, 241, 65 C. C. A. 587; Yale & Towne Mfg. Co. v. Adler (C. C. A. 2d Cir.) 154 Fed. 37, 83 C. C. A. 149; Rushmore v. Badger Brass Mfg. Co. (C. C. A. 2d Cir.) 198 Fed. 379, 380, 117 C. C. A. 255; Ludwigs v. Payson Mfg. Co. (C. C. A. 7th Cir.) 206 Fed. 60, 124 C. C. A. 194; Farmers' Handy Wagon Co. v. Beaver Silo & Box Mfg. Co. (C. C. A. 7th Cir.) 236 Fed. 731.

[6] It is urged that the things in which these structures resemble each other are all of them necessary elements in the performing of functions in the practical work which the structure does, and that they are not for the purpose of appearance. There is some force in that argument, but we ought to have in mind that this is a structure for showcase windows, and not for back cellar windows, or for places where no beauty is desired. They are intended for places where beauty is one of the controlling elements to be considered. A show window is for the purpose of attracting people and getting them to stop and look and be pleased. One of the things desired is to make it beautiful. It is true that these lines are simple, but probably they are more pleasing to the eye than they would be if they were less simple. The exact form is not necessary.

If one sees a practical and useful article on the market, and then later tries to design and devise something to serve the same purpose for their own manufacture, it is difficult even for them to tell to what extent they have been influenced by the article they have previously seen. So in this case it does not matter whether it is done consciously or unconsciously; but it is apparent to me that, not only in the elements and the combination of elements, which I hold to infringe, but also as to the dress and appearance of the product, the plaintiff's structure has influenced the dress and appearance of the defendant's structure. They are so similar in every particular that, even though it was not intentional, I feel that the plaintiff's structure must have influenced the form, shape, dimensions, and appearance of the defendant's structure, as well as the construction of elements which I hold infringe.

It is true the defendant placed its name upon each piece that it manufactured. These pieces are of considerable size, and that would not of necessity mean that each piece, when resold, would have the defendant's name upon it. The name is something that one would not wish to have

in too conspicuous a place; one would probably not want to buy these articles if the name was placed in such a conspicuous way that the ordinary observer would see it. More than that, by placing the name once upon a strip, it is not likely, in every case, to get in such a position that the owner of the building would see it and observe it. What I have said about placing the defendant's name upon these pieces applies to the corner strips and the dividing strips, but does not apply to the sash strips. No name was stamped on the sash strips. Along with the defendant's name appeared the word "Almetal," with the word "Trademark" under it. And these words have also been conspicuously displayed in the defendant's advertising matter. While this is not a large element in the matter, and not a thing that I have given great weight to, I think it is an item to be considered, along with all the other things, upon this question of unfair competition. It seems that the plaintiff was the first to actually make an all-metal strip of this kind for store fronts. The old ones that have been shown me as having been made before plaintiff's two patents in suit, and before plaintiff began to build up its business in these articles, are not commercial articles. They were mere material used by mechanics, along with other material, in building store fronts. They were not sold as standard construction, but sold as so much material, and mechanics bought it as they would buy lumber to build and use in constructing store fronts.

The use of this word "Almetal" as a claimed trade-mark, by the defendant, when in fact, it did not have a trade-mark, and would not be able to get a legal valid trade-mark in this name, was in reality a misrepresentation. It is substantially the word which had been prominently displayed by the plaintiff long prior to its use by the defendant—not the exact word. The word that the plaintiff displayed was "All-Metal," spelling the words correctly, and connecting them with a hyphen; but they are pronounced the same, they meant the same to every one, they are descriptive, they are not fanciful words, and therefore not subject to registration as a lawful trade-mark; so I am not entertaining the thought that defendant infringed any trade-mark of the plaintiff, but simply considering that along with all of the elements in this case, as one of the "straws" directing the conclusion which I feel forced to reach, that defendant has been guilty of unfair competition. This is a term that the plaintiff was using in connection with its business. It was long ago engaged in the business of manufacturing an all-metal construction of this kind. This defendant, before or about the time that it engaged in the operation of the business which I am now about to restrain, must have known of the decree of this court (Kawneer Mfg. Co. v. Toledo Plate & Window Glass, Co. [D. C.] 232 Fed. 362) holding the first-mentioned patent in suit valid.

It is not a pleasant thing to restrain reputable business men from engaging in a business which they have built up, and which is undoubtedly profitable to them, and in a way helpful to the community and to the public. However, there is no question but that, if I am right in my findings of fact and conclusions of law as to these other matters, it is a just law that would restrain, because that business has been built up, as I view it, at the expense of the plaintiff, using things that plaintiff's

genius had devised and really given to the world, and under our patent law, and the law as to unfair competition, defendant ought not to have built up the business which it has built up in these particular articles.

A decree will therefore be entered in favor of the plaintiff for such profits and damages as plaintiff is entitled to under the findings which I have made, and reference will be made to William S. Sayres, Jr., the standing master of this court, to take an accounting as to the damages and profits, and a permanent injunction will issue restraining the defendant from infringing these patents, and from continuing the unfair competition.