### CARSON INV. CO. et al. v. ANACONDA COPPER MINING CO.

#### No. 5228.

Circuit Court of Appeals, Ninth Circuit. February 27, 1928.

On the Merits May 28, 1928.

1. Patents ⚙=>327(4)—Circuit Court of Appeals decree remanding case for accounting held final between parties and privies as to validity and infringement of patents.

Decree of Circuit Court of Appeals *held* final between parties and their privies as to validity and infringement of patents, though termed an "interlocutory decree" and remanding the case for an accounting.

2. Patents ⚙=>327(19)—District Court decree pursuant to mandate of Circuit Court of Appeals, held res judicata on appeal as to validity and infringement of patents.

District Court decree sustaining patents, perpetually enjoining infringement, ordering accounting of damages and profits, and referring case to master, pursuant to mandate of Circuit Court of Appeals, *held* res judicata against defendant as to validity and infringement of patents, when considered merely with relation to right of appeal to Circuit Court of Appeals; only proceedings subsequent to mandate being reviewable on such appeal.

3. Patents ⚙=>327(14)—Corporation jointly controlling and co-operating in defense of patent infringement suit becomes bound by decree.

If *corporation sued for infringement of pat*ents directed its counsel to confer with counsel for corporation theretofore sued in another District Court for infringement of same patents, such counsel participated in preparation for and trial of prior case, and former corporation had right to exercise joint control over litigation, and actually co-operated with latter company in trial and appellate courts, it became privy with defendant in such suit, and

bound by decree therein as to validity and infringement of patents.

4. Patents ⚙=>312(2)—Testimony in infringement suit, to show defendant's privity with defendant in suit wherein same patents were adjudged valid and infringed, held erroneously excluded.

In patent infringement suit, District Court erred in refusing to allow plaintiffs to introduce testimony in support of issue of defendant's privity with defendant in prior suit against another corporation, wherein validity and infringement of same patents were adjudicated.

#### Supplemental Opinion on the Merits.

5. Patents ⚙=>327(14)—Privity between defendants in former and present infringement suits, being waived, new defendant is entitled to all rights shown by facts disclosed by it, notwithstanding prior decisions sustaining patents and enjoining infringement.

Plaintiffs having filed a waiver of question of privity between defendants in present and former patent infringement suits, and requested decision on merits as disclosed by record, court will proceed with case as one in which new defendant is entitled to all its rights, as shown by facts disclosed by it, notwithstanding decisions in prior suits, to which it was not a party, sustaining and enjoining infringement of patents.

6. Patents ⚙=>327(17)—Subordinate court, dealing with patent sustained by appellate court, inquires whether second record contains anything new, and, if so, whether appellate court would have reached different conclusion therefrom.

When a patent has once been sustained by an appellate court, a subordinate court, dealing subsequently with the same patent, inquires first whether the second record contains anything not before the appellate court in the prior litigation, and, if so, whether new matter is such that it may fairly be supposed that the appellate court would have reached a different conclusion, had it been advised of its existence.

7. Patents ⚙=>51(1)—Smelting furnace, with side walls at 60-degree angle and magnetite lining securing noncorrosive embankment, held not to embody disclosure of British patent antedating patents for reverberatory smelting furnaces.

In suit for infringement of Carson patents Nos. 1,149,495 and 1,302,307, relating to reverberatory smelting furnaces, defendant's experimental furnace with side walls inclined at angle of 60 degrees and thick magnetite lining on bottom and sides, securing noncorrosive embankment over which ore was fed continuously, *held* not to embody disclosure of prior British Siemens patent, No. 2,413, stating that incline must be such as to maintain ore thereon by its own gravitation.

8. Patents ⚙=>64—That prior device might be made to carry on particular process is not sufficient to anticipate such process.

The mere fact that a prior device might be made effective for carrying on a particular process is not sufficient to anticipate such process.

**9. Patents ☞167(1½)—There cannot be substantial variance between drawings and specifications, but specifications usually govern.**

There cannot be a substantial variance between the drawings of a patent and the specifications, but, where there is a conflict, the specifications as a rule must govern.

**10. Patents ☞328—Carson patents, Nos. 1,-149,495, and 1,302,307, for smelting furnace with substantially vertical walls, held not anticipated by British Siemens patent, No. 2,413, calling for such incline as to maintain ore thereon by its own gravitation.**

Carson patents, Nos. 1,149,495, and 1,302,-307, for reverberatory smelting furnace with vertical or substantially vertical walls, allowing ore to rest on floor of furnace without impediment by way of inclined surface, *held* not anticipated by British Siemens patent, No. 2,413, calling for walls with such incline as to maintain ore thereon by its own gravitation.

**11. Patents ☞328—Carson patents, Nos. 1,-149,495, and 1,302,307, for smelting furnace, held not anticipated by publication showing rectangular grate fire center-charging reverberatory smelting furnace, disclosing nothing essentially new.**

British publication, in 1860, showing rectangular grate fire reverberatory smelting furnace with center-charging hopper and bridge wall in one end over which flame passed longitudinally to opposite end, where products of combustion were carried upward through smokestack, disclosed nothing essentially new, and did not show anticipation of Carson patents, Nos. 1,149,495 and 1,302,307, by British Siemens patent of 1866, No. 2,413, showing flame entering through opening at one end, taking horseshoe bend and passing out through another opening at same end.

**12. Patents ☞328—Carson patents, Nos. 1,-149,495, and 1,302,307, for reverberatory smelting furnace, held not anticipated by British Siemens patent, No. 2,413, disclosing inoperative device.**

British Siemens patent, No. 2,413, *held* not to anticipate Carson patents, Nos. 1,149,495 and 1,302,307, for reverberatory ore-smelting furnace with substantially vertical walls, even if such prior patent showed 60-degree walls, in view of evidence that device disclosed thereby would be inoperative because of corrosion of incline by smelting of ore at bottom and scaffolding of ore at upper end of chute.

**13. Patents ☞328—Carson patents, Nos. 1,-149,495 and 1,302,307, for reverberatory smelting furnace with substantially vertical walls, held not anticipated by smelting furnace with inner walls inclined at 60-degree angle.**

Statement that ore-smelting furnace with inner walls inclined at 60-degree angle, down which ore slides in body, providing thick blanket of ore between bath and walls, thereby protecting latter, infringes Carson patents Nos. 1,149,495 and 1,302,307, disclosing substantially vertical walls, *held* not admission that walls of British Siemens patent, No. 2,413, calling for such incline as to maintain ore thereon by its own gravitation, were equivalent to walls of Carson patents, if walls of Siemens patent showed 60-degree angle.

**14. Patents ☞328—Carson patents, Nos. 1,-149,495 and 1,302,307, for reverberatory smelting furnace, held not anticipated by British Siemens patent, No. 3,077, disclosing inclined metal sides without brick lining.**

Carson patents, Nos. 1,149,495 and 1,302,-307, for reverberatory ore-smelting furnace, *held* not anticipated by British Siemens patent, No. 3,077 of 1871, disclosing steel crucible with inclined metal sides without brick lining, and not mentioning corrosive action or wall protection; no corrosive ores being used in such furnace.

**15. Patents ☞312(3)—Use of roasted pyrrhotite in testing furnace held not to show that experiment was sham, or statements to Patent Office respecting it fraudulent, in suit for infringement of Carson patents, Nos. 1,149,-495 and 1,302,307, for copper smelting furnace.**

Use of roasted pyrrhotite, which melts at temperature of 1800 degrees, instead of iron and copper ore, which fuses at higher temperature, in testing furnace with sloping walls with special reference to sulphur process sought to be developed, *held* not to justify condemnation of experiment as sham, or statements to Patent Office respecting it as fraudulent, in suit for infringement of Carson patents, Nos. 1,149,495 and 1,302,307, relating to reverberatory furnaces for smelting copper and other ores.

**16. Patents ☞283(1)—Patent cannot be attacked for fraud on patent officials in infringement suit between private parties.**

In litigation between private parties for infringement of patent, patent cannot be attacked for fraud, said to have been practiced by patentee on patent officials in procurement of patent.

**17. Patents ☞328—Carson patents, Nos. 1,-149,495 and 1,302,307, for smelting furnace, held not anticipated by center feed furnaces with side hoppers for fettling sand.**

Ore-smelting center feed furnaces, with side hoppers for sand, requisite to form bank of fettling material to protect sides from corrosion, *held* not to anticipate Carson patents, Nos. 1,149,495 and 1,302,307, calling for charging of ore exclusively down side walls and fettling by banking ore against furnace sides.

**18. Patents ☞324(5⅝)—District Court's conclusion on conflicting evidence leaving reasonable doubt of anticipation will not be upheld.**

If evidence fails to prove anticipation so cogently as to leave no reasonable doubt in mind of Circuit Court of Appeals, it will not uphold District Court's conclusion that prior use has been proven, merely because of serious conflict in evidence as to such use.

**19. Patents ☞327(18)—Circuit Court of Appeals must determine whether evidence justifies District Court's conclusion as to anticipation of patents, where another District Court of circuit has decided differently on substantially same evidence.**

Where one District Court has decided on conflicting evidence that patents are valid for want of sufficient evidence to sustain defense of anticipation, while another such court in same circuit has decided to contrary on substantially

same evidence, with some additional testimony, Circuit Court of Appeals must review finding and examine evidence, to determine whether it is of sufficient strength to justify trial court's conclusion, though presumably correct.

20. Patents ⬤☞328—Carson patents, Nos. 1,-149,495 and 1,302,307, for reverberatory smelting furnaces, held infringed by gravity feed furnaces with sloping banks, though not expressly calling for vertical walls.

Carson patents Nos. 1,149,495 and 1,302,-307, for reverberatory ore-smelting furnaces with overhead receptacles so arranged that material passes into furnace by gravity and sloping enbankment formed on floor and along walls between them and bath by ore, held infringed by gravity feed furnaces with banks sloping against walls at 76 and 60 degree inclines, though not in terms calling for vertical walls; claim not being limited to such walls.

21. Patents ⬤☞328—Carson patents, Nos. 1,-149,495 and 1,302,307, held infringed by use of invention to substantial extent in protecting side walls of smelting furnace from heat.

Infringement of Carson patents Nos. 1,-149,495 and 1,302,307, for reverberatory ore-smelting furnace, cannot be avoided by not using invention to its full extent in protecting side walls from heat, but yet using it to a substantial extent.

22. Patents ⬤☞328—Carson patents Nos. 1,-149,495 and 1,302,307, for smelting furnace, held infringed by furnace with sloping banks and hearth transferring bath from smelting to skimming end.

Infringement of Carson patents Nos. 1,-149,495 and 1,302,307, for reverberatory smelting furnace with sloping embankments of smelting ore, protecting side walls from heat and bath, held not avoided by furnaces with sloping embankments and hearth transferring bath from smelting to skimming end.

23. Patents ⬤☞290—Patentee, making assignment to trustee, but retaining beneficial interest, held proper party plaintiff in infringement suit.

Patentee retaining beneficial interest in patents and their proceeds held proper party plaintiff in suit for infringement, though he had made assignment to trustee before filing complaint.

24. Patents ⬤☞310(10)—Amendment of bill in patentee's infringement suit by making trustee, to which plaintiff had made assignment, and corporation, to which he and trustee assigned patents and proceeds, parties plaintiff, held proper.

Where patentee, after bringing suit for infringement, assigned all his interest in patents and their proceeds to corporation, and trustee, to which he had theretofore made assignment, later assigned them to such corporation with consent of all beneficiaries of trust, it was proper to amend bill by making trustee and such corporation parties, and showing that it obtained its title through trustee.

Dietrich, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit by the Carson Investment Company and another against the Anaconda Copper Mining Company. From a decree of dismissal (17 F.[2d] 815), plaintiffs appeal. Reversed and remanded, with directions.

See, also, 14 F.(2d) 559.

John H. Miller, Charles S. Wheeler, Jr., and A. W. Boyken, all of San Francisco, Cal., John M. Zane, of Chicago, Ill., and L. P. Sanders, of Butte, Mont., for appellants.

L. O. Evans and D. Gay Stivers, both of Butte, Mont., W. Clyde Jones, Arthur B. Seibold, Arthur A. Olson and Thorley von Holst, all of Chicago, Ill., and D. Anthony Usina, of New York City, for appellee.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

HUNT, Circuit Judge. The Carson Investment Company and Miller, as trustee, appeal from a decree dismissing their complaint against the defendant appellee, Anaconda Copper Mining Company, for infringement of patents No. 1,149,495 (August 10, 1915) and No. 1,302,307 (April 29, 1919), both relating to reverberatory furnaces for smelting copper and other ores, issued to George C. Carson. Carson Investment Co. v. Anaconda Copper Co. (D. C.) 17 F.(2d) 815.

History of the patents will be found in the opinion in Carson v. American Smelting & Refining Co. (C. C. A.) 4 F.(2d) 463, wherein, on appeal from the decree of the United States District Court for Washington (293 F. 771), we held that the two patents were valid, that they had been infringed, that injunction should issue, and that accounting should be had. The decree of this court reversed the decree of the District Court, and remanded, with directions to enter a decree in accord with the views expressed in our opinion.

In due course the case went back to the District Court for Washington, and in accordance with the mandate of this court a decree was entered, sustaining the patents adjudged infringed, awarding perpetual injunction, ordering an accounting of damages and profits, and referring the case to a master to take the accounting.

In the present or Montana case the Carson Company, by a supplemental complaint, alleged the pendency of the above-mentioned case against the American Smelting & Refining Company and the decision and decree of the Circuit Court of Appeals therein; averred that the machines and processes used

by the Anaconda Mining Company and alleged in the original bill of complaint to be infringements upon the patents in suit are substantially identical with the machines and processes used by the American Smelting & Refining Company, which were adjudged by the Circuit Court of Appeals to be infringements upon the patents in suit. It was further alleged that the patents involved and the issues raised in the suit of Carson v. American Smelting & Refining Co., supra, are the same as the patents involved and the issues raised in the present suit against the Anaconda Company; that, immediately upon the commencement of the suit of Carson v. American Smelting & Refining Co. in the District Court for Washington, the Anaconda Company, appellee herein, joined and co-operated with the American Smelting & Refining Company in the defense of that suit by employing and paying counsel to conduct, and who did conduct, the defense thereof, by hunting up evidence and witnesses who testified in the case, by carrying on all the activities and exercising all the rights of a defendant, and by conducting the defense in conjunction and in co-operation with the American Company, to the same extent as they would have been entitled to do if the Anaconda Copper Mining Company had been named as a formal defendant therein, and had been charged in the complaint with infringement of the patent in suit; that the Anaconda Copper Mining Company continued to act cojointly and to co-operate with the American Smelting & Refining Company in the defense of said suit during all its stages and proceedings in the District Court of the United States for Washington, and in the matter of the appeal heretofore referred to in the United States Circuit Court of Appeals for the Ninth Circuit; that all of the aforesaid acts and doings of the Anaconda Copper Mining Company in respect to the defense of the suit of Carson against the American Smelting & Refining Company, both in the District Court for Washington and in the United States Circuit Court of Appeals for the Ninth Circuit, were had, taken, and done by the Anaconda Company openly and publicly, and to the knowledge at all times of the said Carson, whereby the Anaconda Copper Mining Company became a privy to and with the American Smelting & Refining Company, defendant in that suit, and bound by all the proceedings, orders, opinions, and decrees rendered therein, as fully and completely as if the Anaconda Company had been named as a defendant.

Defendant, answering, admitted that the patents were the same, and that the Anaconda Company had contributed money to the defense in the case in the District Court, but denied the other allegations.

When the present case was brought to trial, plaintiffs called as a witness Mr. Usina, who had participated in the examination of witnesses in the American Smelting & Refining Case and was an attorney of record for the defendant in the instant case. After a few preliminary questions, the court asked what was the object of the examination. Counsel for plaintiffs stated that it was to elicit facts showing privity by virtue of the agreement between the American Smelting & Refining Company and the Anaconda Copper Company as to a joint defense of the American Smelting & Refining Co. Case. Upon objection by defendant, the court ruled that the decree in the American Smelting & Refining Co. Case was merely interlocutory, was subject to change on appeal from the accounting, and therefore was not res adjudicata as against the American Smelting & Refining Company, or any one else. The witness was then directed to leave the stand, and counsel for the plaintiffs were not permitted to question him further. The court also rejected plaintiffs' offer of a certified copy of the decree in the American Smelting & Refining Co. Case, which decree the District Court in Washington had entered pursuant to the mandate of the Circuit Court of Appeals. The trial was then proceeded with, and, after much evidence was heard, the patents were held to be invalid upon the grounds that they had been anticipated, that there had been prior use, and that certain alleged false and fraudulent misrepresentations had been made by Carson to the officials of the Patent Office during the pendency of his application for patent.

A clearer understanding is had by mention of these additional facts: The suit of Carson v. American Smelting & Refining Co., supra, was instituted in the District Court in Washington in November, 1921. The Circuit Court of Appeals in February, 1925, made the order and decree above outlined. Carson v. A. S. & R. Co., 4 F.(2d) 463. Petition for rehearing was denied, and writ of certiorari was denied by the Supreme Court. A. S. & R. Co. v. Carson, 269 U. S. 555, 46 S. Ct. 18, 70 L. Ed. 409. The American Smelting & Refining Company then moved the Circuit Court of Appeals for permission to be granted to the District Court to consider a motion to reopen the case for the purpose of allowing the introduction of certain newly discovered evidence, especially

pertaining to alleged prior use at Dollar Bay, Mich. Many affidavits filed in support of the application to reopen set forth that the newly discovered evidence was not known until after the decision of the court on the merits in February, 1925. This court held that the evidence outlined in the affidavits was not sufficient to operate as an anticipation, and on March 1, 1926, denied the application to reopen. Carson v. A. S. & R. Co. (C. C. A.) 11 F.(2d) 766. The American Smelting & Refining Company also applied to this court to abate the suit, on the grounds that Carson was not a proper party to maintain it, inasmuch as he had assigned the legal title to the patents to his attorney, John H. Miller, as a trustee. That motion was denied. Carson v. A. S. & R. Co. (C. C. A.) 11 F.(2d) 764.

To review our decision in that matter, the American Smelting & Refining Company applied to the Supreme Court for a writ of certiorari, but the application was denied on October 11, 1926. A. S. & R. Co. v. Carson, 273 U. S. 695, 47 S. Ct. 92, 71 L. Ed. 844. Thereafter, when the mandate from the Circuit Court of Appeals went down to the District Court in Washington, there was a hearing as to the alleged defect in parties, and John H. Miller as trustee, and the Carson Investment Company, a corporation, were joined as coplaintiffs with Carson. The interlocutory decree hereinabove referred to was then entered, and the accounting is still pending.

Under the facts stated, at once the question arises whether the decision and decree of this court in the American Smelting & Refining Co. Case as to the validity and construction of the patents is res adjudicata, not alone as to the defendants of record to that suit, but is an estoppel as to those in privity with the defendant therein.

[1] It is very clear that the decree of this court in the American Smelting & Refining Case in its essence and substance was final as to the validity of the patents involved, and as to the fact that there had been infringement. The questions of novelty and infringement were the pivotal ones before the court. They were considered and conclusively disposed of by our decree; hence they were finally settled.

It was not in the power of the District Court to open them, unless after permission granted by the Circuit Court of Appeals. The Supreme Court, in Re Potts, 166 U. S. 263, 17 S. Ct. 520, 41 L. Ed. 994, referring to the duty of the lower court in a case where a patent was held valid and infringed and that the infringer must account, said that the lower court could not vary or examine the decree of the Supreme Court for any other purpose than execution, or give any other or further relief, or review it even for apparent error, upon any matter decided on appeal, or intermeddle with it further than to settle so much as has been remanded. The Supreme Court also referred to a distinction between a final decree that wholly disposes of all the issues, and a decree which may not be technically final, because there remains the matter of an accounting; and the opinion was expressed that, while the matter of accounting for infringement still remains for disposition in the lower court, the decree and decision upon the questions of novelty of the alleged invention and of infringement had been presented, considered, and decided by the Supreme Court, and must, therefore, be deemed to have been finally settled, and could not afterward be reconsidered by the lower court. We regard that case as sustaining the principle that if, in a patent litigation, a decree finally determines the principal issues of validity and infringement presented by the pleadings, and settles the litigation over those issues, it is so far conclusive as to determine other litigation between the same parties over the very same issues. The term "interlocutory decree" does not lessen the real character of such a judgment when, in other litigation over the same issues between the same parties, the plea of res adjudicata is set up.

In Hart Steel Co. v. R. Supply Co., 244 U. S. 294, 37 S. Ct. 506, 61 L. Ed. 1148 (1917), on certiorari, the Supply Company sued the Hart Company and Wood in the United States District Court in Illinois, praying injunction for infringement. Three months later the Supply Company sued the Elyria I. & S. Company in the United States District Court in Ohio for the same relief as against it, as had been sought in the suit in Illinois. The Elyria Company owned all the capital stock of the Hart Company, which was the selling agent of the Elyria Company, with Wood as manager. The Illinois case was dismissed on the ground that there was no infringement, and at a later date, in the Ohio case, similar decree was made. Appeals in both cases were taken. In the Ohio and second case the Circuit Court of Appeals for the Sixth Circuit affirmed the decree of the District Court. Soon thereafter, however, in the Circuit Court of Appeals for the Seventh Circuit, where the appeal was still pending, the Hart Company and Wood moved the Circuit Court of Ap-

peals to affirm the decree of the District Court on the ground that the issues had been adjudicated by the Circuit Court of Appeals of the Sixth Circuit, wherein the Elyria Company was in privity with the Hart Company and Wood. The court denied the motion.

Afterward, when the appeal was argued on its merits, the Circuit Court of Appeals held the patents valid, and reversed, with directions to take an accounting. On review by the Supreme Court, the question considered was whether or not the decree in the Sixth Circuit Court of Appeals was a "final determination" of the issues presented in the case pending in the Seventh Circuit Court of Appeals, so as to be res adjudicata and binding on that court. It was held that there was identity of interest, that the Hart Company and Wood, as agents, were necessarily privies to the judgment rendered in the Sixth Circuit in favor of the Elyria Company, and that the Circuit Court of Appeals for the Seventh Circuit erred in overruling the motion to affirm the decision of the Circuit Court of Appeals for the Sixth Circuit. "The doctrine of res adjudicata," said the court, "is not a mere matter of practice or procedure, inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, * * * which should be cordially regarded and enforced by the courts, to the end that rights once established by the final judgment of a court of competent jurisdiction shall be recognized by those who are bound by it in every way wherever the judgment is entitled to respect." See, also, Larkin v. Bassick (C. C. A. 7) 19 F.(2d) 944; National Brake & E. Co. v. Christensen (C. C. A. 7) 258 F. 880.

The last-mentioned case, an application for an order dismissing a bill, has a bearing, and although the decision was reversed by the Supreme Court (254 U. S. 425, 41 S. Ct. 154, 65 L. Ed. 341), the principle apposite to our case was not disturbed. Judge Baker said: "Indeed, throughout the world of English-derived jurisprudence, there is unanimity that a decree which, on issues joined, and on submission by the parties and consideration by the court of all the evidence the parties can or choose to adduce and all the law the parties and the court deem applicable, adjudges that the complainant is the owner and entitled to the exclusive possession of property and that the defendant has unlawfully invaded the complainant's rights, and orders the defendant to surrender or keep away from the property forever, is a final decree on those issues, even though the is-

sue concerning profits or damages from the defendant's trespasses has been reserved for future judicial action." See, also, National Brake & Elec. Co. v. Christensen (C. C. A.) 278 F. 491.

Appellee cites Simmons v. Grier Bros. Co., 258 U. S. 82, 42 S. Ct. 196, 66 L. Ed. 475, as holding that, where inquiry before the master is necessary before a final decree can be had, there can be no final decree in the suit. In stating that rule, the court had before it the question whether, on an application to file a bill of review, a decree, such as was entered in the American Smelting & Refining Co. Case, was final. It was held not to be final, and that a bill of review could not be brought. The court applied the strict rule that a bill of review is only called for after all controversies between the parties are settled by final decree which adjudicates upon the entire merits, leaving nothing to be done except the execution of the decree. The court did not disapprove of the Potts Case, supra, and we find no necessary inconsistency between the two decisions.

Merriam Co. v. Saalfield, 241 U. S. 22, 36 S. Ct. 477, 60 L. Ed. 868, may also be harmonized with the Potts Case. The decision there was upon a question of jurisdiction of the District Court to enforce a decree against one who was a nonresident stranger to the main suit, and who was served by substituted process after supplemental bill was filed. Hamilton-Brown Shoe Co. v. Wolf Bros., 240 U. S. 251, 36 S. Ct. 269, 60 L. Ed. 629, also cited, a trade-mark case, decided that a decree of the District Court ordering an injunction and accounting with respect to the trade-mark was not so far final as to give the right to apply to the Supreme Court for a writ of certiorari. The case is not authority for holding that in a patent suit a decree sustaining the patent as valid and ordering an accounting is not final, in so far as it affects the validity of the patent.

[2] Considered merely with relation to right of appeal to this court, the decree entered in the District Court in pursuance of the mandate of this court is clearly res adjudicata against the American Smelting & Refining Company, in so far as it determined validity and infringement of the patent, for on those points no appeal would lie. If, after accounting has been had, appeal may be taken, only the proceedings subsequent to the mandate would be presented for review. Roberts v. Cooper, 20 How. 481, 15 L. Ed. 969; Illinois v. I. C. R. Co., 184 U. S. 91, 22 S. Ct. 300, 46 L. Ed. 440.

[3] The sequel of our views is that, the decree in the American Smelting & Refining Co. Case, being res adjudicata as to the issues referred to between parties of record in that suit, is equally conclusive as to the same issues upon those in privity with the American Smelting & Refining Company. We agree with appellee in the contention that the judgment could not be relied upon as an estoppel merely because the Anaconda Copper Company contributed some money toward the defense of the American Smelting & Refining Company suit, gathering testimony for the defense; but that does not meet the broader proposition that if the Anaconda Company directed its counsel to confer with counsel for the American Smelting & Refining Company, and if such counsel participated in the preparation of the case for trial and in the trial of the issues, and if the Anaconda Company had the right to exercise joint control over the litigation, and did actually co-operate with the American Smelting & Refining Company in the trial and appellate courts, all as more particularly alleged, it became privy to the American Smelting & Refining Company suit, and bound by the decree therein as to the validity of the patents and the infringement of them; wherefore the decree in the American Smelting & Refining Co. Case should be an estoppel upon the issues of validity and infringement. Miller v. Liggett & Myers (C. C.) 7 F. 93; Norton v. San Jose (C. C. A.) 79 F. 793; Theller v. Hershey (C. C.) 89 F. 575; General Film Co. v. Sampliner (C. C. A.) 252 F. 443.

[4] It was error, therefore, on the part of the District Court to refuse to allow the plaintiffs to introduce the testimony offered in support of the issue of privity. Had plaintiffs prevailed on that issue, it would have been unnecessary to inquire into the validity of the patent or its infringement. And in orderly procedure we think it ought first to be disposed of here. Directions will therefore issue to the District Court that, upon notice to the parties and with reasonable dispatch, it take the evidence upon this issue and cause the same, together with its findings thereon, to be certified to this court, and when so certified such supplemental record will be deemed to be a part of the record upon the present appeal, having the same force and effect as if it had been a part of the original record, without further formality of appeal or assignment of error. Each party will in the first instance pay its own costs, but the same will, upon final disposition of the case, be justly taxed.

Should the parties desire to simplify the record and avoid expense, by stipulating the facts, or by agreeing upon some other economical mode of taking the evidence, or should any further directions be required, appropriate orders will, upon application, be entered.

## Supplemental Opinion on the Merits.

HUNT, Circuit Judge. [5] After filing the foregoing opinion and decision, plaintiffs filed a waiver of the question of privity and requested the court to decide the case on the merits as disclosed by the record. We therefore proceed with the case as one in which the new defendant is entitled to all its rights as shown by the facts disclosed by it, notwithstanding the decisions in prior suits to which defendant was not a party. Andrews v. Hovey, 123 U. S. 267, 8 S. Ct. 101, 31 L. Ed. 160; Beach v. Hobbs (C. C.) 82 F. 916; Safety Car Heating & Lighting Co. v. Gould Coupler Co. (D. C.) 245 F. 755; Tilghman v. Proctor, 102 U. S. (12 Otto) 707, 26 L. Ed. 279; Union Switch & Signal Co. v. Hall Switch & Signal Co. (D. C.) 228 F. 709.

[6] Our examination, however, is made with observance of the settled rule that, when a patent has once been sustained by an appellate court, a subordinate court, dealing subsequently with the same patent, inquires first whether the second record contains anything not before the appellate court in the prior litigation, and, if it finds something new, inquires next whether the new matter is of such a character that it may fairly be supposed that the appellate court would have reached a different conclusion, had it been advised of its existence. Badische A. & S. F. Co. v. Klipstein & Co. (C. C.) 125 F. 543; Rousso v. Bank (D. C.) 19 F.(2d) 247; Conley v. Thomas (D. C.) 204 F. 93; Flat Slabs Patents Co. v. Wright et al. (D. C.) 283 F. 345; Bone v. Marion County, 251 U. S. 134, 40 S. Ct. 96, 64 L. Ed. 188.

[7, 8] It is argued that there is a difference between the A. S. & R. Case and the present one, in that there is new evidence as to the capability of operation of the disclosures of the Siemens patent, No. 2,413, issued in 1866; new evidence that in 1866, when Siemens' patent was granted, smelting of copper ores in reverberatory furnaces was an extensive commercial industry; an alleged admission by plaintiff as to the equivalency of vertical and inclined walls; and evidence of new and additional patents by Siemens disclosing side charging.

During the pendency of the present suit

the defendant built a furnace at Anaconda, Mont., which, it is contended, was constructed in strict accordance with the disclosures of the Siemens patent, No. 2,413. Although admittedly a small furnace, it is said that it was made in detail from the Siemens patent and was of a size in use in 1866. The furnace, so constructed, was operated with charging material available during the six or seven months of operation. That material, however, was not such as was used at the time of the operation of the Siemens smelter, because flotation concentrates were not in use in 1866. The contention is that the walls of the furnace were protected; that the ore charged down continuously, depositing itself on the bottom and against the side walls, and afforded full protection; and that there was no scaffolding of the ore or clogging in the operation of the furnace.

But an important difference between the furnaces is at once noticeable. In the experimental furnace the inclined sides are arranged at an angle of 60 degrees. The Siemens patent states that the incline must be such as to maintain the ore thereupon by its own gravitation. It would seem self-evident that ore cannot be maintained by its own gravitation on a surface with an incline of 60 degrees, because at that angle the ore will slide down; the angle being greater than the natural angle of repose. Therefore, if we have a furnace with an inclination of 60 degrees, there is a departure from the Siemens disclosure, and a conflict with the text of the Siemens specification.

Again, in the Anaconda experimental furnace defendant built a thick magnetite lining on the bottom of the furnace and the sloping sides, for the purpose of obtaining a noncorrosive lining. Small charges of ore were first fed, and after semifusion and hardening another small charge was put upon the hardened surface, which was also semifused and then hardened. An embankment was thus secured, and the ore was fed over the surface continuously with the impervious embankment of magnetite protecting the sides and bottom from erosion. Siemens described no such process, nor can we believe that by the use of such a method defendant can escape the rule of Carnegie Steel Co. v. Cambria, etc., Co., 185 U. S. 425, 22 S. Ct. 707, 46 L. Ed. 968, where the Supreme Court said that, "if the mere fact that a prior device might be made effective for the carrying on of a particular process were sufficient to anticipate such process, the absurd result would follow that, if the process consisted merely of manipulation, it would be anticipated by the mere possession of a pair of hands." Topliff v. Topliff, 145 U. S. 161, 12 S. Ct. 825, 36 L. Ed. 658.

In Carnegie Steel Co. v. Cambria, etc., supra, the court also said: "A process patent, such as that of Jones, is not anticipated by mechanism which might with slight alterations have been adapted to carry out that process, unless, at least, such use of it would have occurred to one whose duty it was to make practical use of the mechanism described. In other words, a process patent can only be anticipated by a similar process. A mechanical patent is anticipated by a prior device of like construction and capable of performing the same function; but it is otherwise with a process patent." See, also, Kings County R. & F. Co. v. United States Consolidated S. R. Co. (C. C. A.) 182 F. 59.

[9] It was not decided in the A. S. & R. Case that Siemens had a 60-degree angle wall. On the contrary, it was plainly indicated that the angle of the side walls must be capable of permitting the ore thereon to be maintained by its own gravitation; that is, where the angle of the side walls is in correspondence to the angle of repose of the ore. It is true that in his 1866 patent, in two of his drawings, Siemens shows an angle of 60 degrees, or very nearly so, while in his specification he gave no particular angle. But in our opinion that does not change the situation. Of course, there cannot be a substantial variance between the drawings of a patent and the specification. Where there is a conflict, as a rule, the specifications must govern.

[10] Carson's patent shows vertical walls, or walls substantially vertical; hence it is impossible for ore to be maintained thereon by its own gravitation. His patent shows the ore resting upon the floor of the furnace, without impediment by way of an inclined surface. All this was carefully stated by Judge Gilbert for the court in the A. S. & R. Case. He said:

"In brief, the board were of the opinion that, if the angle of the inclined side walls was sufficient, as Siemens declared it to be, to maintain thereupon the ore by its own gravity, there was lacking the essential feature of the appellant's invention, in which the ores rest upon the floor of the furnace and against the side walls thereof, and by their own weight, unimpeded by an inclined surface, sink as rapidly as is permitted by the fusion of the mass upon the floor of the furnace. The Siemens patent was a failure and it never went into use, and while it may be conceded that Siemens was the first to con-

ceive the idea of utilizing the ores to protect the side walls of a furnace, the fact remains that, if his invention was ever at any time adopted in a reverberatory furnace, it must have resulted in failure, for we find for forty years thereafter, and up to the time of the appellant's invention, that there was universal use in reverberatory furnaces of perpendicular side walls, the banking of materials against them for protection thereof, and the supply of ores through openings along or near the center line of the roof, and never at the sides." 4 F.(2d) 465.

See Permutit v. Harvey (D. C.) 274 F. 937; Hogg v. Emerson, 11 How. 587, 13 L. Ed. 824; Kryptok v. Stead Lens Co. (D. C.) 207 F. 85.

The argument that, if the side walls are not inclined, they would necessarily be vertical, is not specially forceful; for, considering the specification that the walls must be of an inclination sufficient to maintain the ore thereupon by its own gravitation, and that vertical walls would not maintain the ore by its own gravitation, it is clear that vertical walls would not answer Siemens. Nor would any wall so nearly vertical that ore would not be maintained thereon by its own gravitation.

We therefore conclude that the Anaconda furnace, with its side walls inclined at an angle of 60 degrees, does not embody the Siemens disclosure. Considering, also, the lack of substantial evidence that Siemens' furnaces had ever been put to use, we find no reason for modification of the statement in our former opinion that Siemens' patent was a failure and never went into use.

[11] It is said that the new evidence proves that in 1866 smelting of copper ore in reverberatory furnaces was an established practice, and that Siemens' statement in his patent that his furnace might be used for fusion and reduction of copper ores taught in the art. In this connection the defendant introduced a publication by Lanborn in London in 1860, wherein Lanborn showed a furnace of rectangular form, having a center charging hopper, in which the ore was discharged into the center of the furnace chamber. In one end was a bridge wall, and the flame produced by combustion of coal poured over the bridge wall and passed in longitudinal route over the ore to the opposite end, where the products of combustion were carried upward through the smokestack. Obviously, that method differed from Siemens, who showed the flame entering through an opening at one end, then taking a horseshoe bend, and passing out through another opening placed at the same end. Again, Lanborn described merely a grate fire center-charging reverberatory furnace—a furnace such as had been in use for many years, and which in the A. S. & R. Case we recognized had been used for nearly half a century. The process described by Lanborn in his publication was therefore not in its essence new matter. By like reasoning we must regard Bell's furnace (1842) as disclosing nothing essentially new.

[12] This brings us to the contention that plaintiff had admitted equivalency of vertical and inclined walls. This assumes that Siemens disclosed 60-degree walls, a proposition which we have already referred to as unwarranted. We observe, however, that even upon an assumption that Siemens does show 60-degree walls, still the great weight of the evidence is that his device as disclosed would be inoperative for the reason that the ore at the bottom of the incline would smelt and expose the incline there to a corrosive action and the ore at the upper end of the chute would scaffold, and retard further descent of ore.

[13] Nor is there an admission by plaintiff that, if the walls of Siemens show 60 degrees, they are the equivalent of Carson's walls. Saying that the defendant's furnace No. 3 infringes is not to admit equivalency. We understand from the evidence that the furnace built by defendant has a heavy brick side wall, with an outer line vertical and an inner line inclined at an angle of 60 degrees. The ore in the furnace slides down the inclined walls in a body, and provides a thick blanket of ore between the bath and the walls, thus protecting the walls. But by its own gravitation the ore is not maintained on the incline; hence a furnace having such walls is not the furnace wall as described by Siemens.

[14] Of the new and additional patents, the most important are Siemens, No. 3,077 of 1871, and his French patent, No. 93,906 of 1872. Patent 3,077 is a steel crucible mounted with its sides inclined and made of metal. There is no brick lining on the metal sides; nor is there any mention in the patent (referring to Fig. 6 thereof) as to corrosive action or wall protection. The problem of protection of brick walls of the furnace does not seem to have had consideration. It is not improbable that, if corrosive ores were used in such a furnace, the result would be failure. The furnace was used with ore with a percentage of carbon which, in turn, produces magnetite, which is not corrosive.

The French patent has no stronger bearing as an anticipation, and, having held in

the A. S. & R. Case that the Siemens patent of 1885, No. 14,143, was not an anticipation, we do not regard No. 3,077, which is substantially like No. 14,143, as an anticipation.

[15] The appellee says that there is new evidence which shows that the Patent Office was misled, and that it granted the second Carson patent in view of false representations made by Carson with respect to certain tests conducted by him in an experimental furnace which he constructed at West Berkeley, Cal.

It appears that Carson, in a brief before the Primary Examiner in the Patent Office, filed in November, 1918, after referring to experiments he had made with a furnace constructed with side walls sloping 60 degrees, with feed ports arranged to drop the charge vertically upon the top of an inclined plane, described the occurrence of scaffolding, and also stated that below where the scaffolding took place the furnace walls were bare, and that the smelted charge slid down the bare furnace walls and floated out into the slag stratum, and did not protect the walls below the scaffolding, but added to their scarification. The Examiner rejected the claims.

Appellee insists that the test made was a sham, inasmuch as Carson used pyrrhotite, which is a fusible ore, and that he willfully misled the Patent Office, where he stated that he had used iron and copper ore. In his experimental furnace, Carson, having had Siemens' patent cited against him in the Patent Office, was making certain researches, with special reference to a sulphur process that he was trying to develop. Sulphide ore taken from a California mine was used, and in testing out the furnace which had sloping walls he used pyrrhotite. Pyrrhotite ore is a mixture of iron sulphide and a small percentage of copper sulphide. The fusion temperature of pyrrhotite is conceded to be lower than of the ordinary charge of copper smelting ore. It is also in evidence that the principal use of pyrrhotite is in the manufacture of sulphuric acid. However, Carson testified that in his experiment he roasted the sulphide ore before he built the furnace.

[16] Roasted pyrrhotite may not generally be characterized as a smelting ore, but, as it is in evidence that it melts at a temperature of 1800 degrees, the fact that it was used under the circumstances explained does not justify the condemnation of Carson's experiment as a sham, or his statements respecting the experiment as fraudulent. And, after all, the matter of alleged false representations to the Patent Office is irrelevant, for it has long since been established that, in litigation between private parties for infringement of a patent, the patent cannot be attacked for fraud said to have been practiced by the patentee on the patent officials in the procurement of the patent. The doctrine of Rubber Co. v. Goodyear, 9 Wall. 796, 19 L. Ed. 566, has been followed by the Supreme Court in Railroad Co. v. Harris, 12 Wall. 65, 20 L. Ed. 354, and in Mowry v. Whitney, 14 Wall. 434, 20 L. Ed. 858, and accepted as correct in the recent case of Baldwin v. Robertson, 265 U. S. 168, 44 S. Ct. 508, 68 L. Ed. 962.

[17] We next turn to the question of invention and operation at the smelting works of the Lake Superior Smelting Company at Dollar Bay, Mich., in respect to' which the District Court found that, beginning in 1898 and continuing up to 1906, furnaces embodying the inventions of both of Carson's patents were there conceived and put into operation.

Based upon the evidence by affidavit and counter affidavit before us in support of the application to reopen the A. S. & R. Case, our former decision was that there was no proof that any person other than Carson ever conceived the idea of dispensing with fettling by banking the ore against the furnace sides, and, furthermore, that even if other furnaces were, in fact, operated in the manner asserted by the A. S. & R. Company, it must have been done "without any conception of the inventive idea" which underlies the Carson patent.

It is urged, however, that in the trial of this case the several drawings and blueprints, said to have been found in the records of the Lake Superior Smelting Company, are convincing proof of public use. Inasmuch as a detailed analysis of the documents would carry this opinion to unreasonable length, we shall make but brief reference to certain points which specially impress us.

In 1898 the superintendent of the Dollar Bay plant began the construction of a large copper smelting furnace 40 feet long and 17½ feet wide. The mineral was fed through holes on the center line of the furnace. There were also square holes on the sides, the object being to enable sand to be poured down through the holes, this being requisite to form a bank of fettling material to protect the sides against corrosive action of the melted ore. The furnace had no hopper; nor do the drawings show holes along the sides in the roof of the furnace. In 1900 and 1901 another large furnace, No. 9, was built at Dollar Bay. The drawings for that furnace show square hoppers for center feeding, with feeding holes on each side of the center axis.

Four side doors are shown for the purpose of feeding sand by shovels. Fettling was required. There is some evidence that this was changed in 1904 and 1905, but the drawings of October 15, 1904, show a square center-charging hopper.

Furnaces No. 10 and 11 come next. The contract for No. 10, let in May, 1903, called for a furnace like No. 9, or one constructed with center axis holes for feeding ore, and four side doors through which fettling material was to be introduced. The uncorrected drawing of No. 10 furnace shows a center-charge furnace. But in another drawing, dated November, 1903, fourteen round hoppers are shown above the furnace, supported by the superstructure. Four of the hoppers are placed on each side of the center lengthwise line of the furnace, very close to the center line. It is quite evident that the eight center feeding hoppers were for feeding mineral into the holes below the hoppers, while the side hoppers were for feeding sand. But fourteen hoppers do not seem to have been provided. There was introduced a corrected blueprint of the drawing, which showed the word "omit" upon two of the side hoppers on each side. This left eight middle hoppers and two side hoppers, one on each side, and on one of the side hoppers there appear the words "Sand 6,000 lbs." Again, two of the center hoppers are marked "Mineral." In the light of the documentary evidence, the conclusion to be drawn is that it was never intended that the furnace was for side-charging. In furnace No. 11, ten hoppers are also shown, arranged eight along the center longitudinal line, and one on each side at the side wall. As the sketches show that No. 11 was to be exactly like No. 10, the sketch adds strength to the appellants' contention that both furnaces had center feeding hoppers and were not built for side feeding.

Some help is found, too, in a sketch dated October 15, 1904, introduced by plaintiffs. It showed for furnace No. 10 eight round hoppers placed as they appeared on the previous drawings and four round hoppers as they had been placed on furnace No. 11. It appears these last referred-to sketches were changed subsequently, and fourteen hoppers appeared on furnace No. 10, and ten hoppers on furnace No. 11. But the blueprints of the main sketch were introduced, and compel the conclusion that the drawings were for a center-feed furnace with side hoppers for sand. At least there is no escape from the opinion that it was never intended that the ore was to be charged exclusively down the side walls of the furnace, as Carson's patents called for.

[18] We are mindful that the evidence as to prior use is conflicting, and that there is testimony that there was a practice of side-charging in the smelters at Dollar Bay. But in patent litigatiton the mere fact that there is a serious conflict in the evidence as to prior public use, and that the District Court has made its findings in favor of defendants in conformity to evidence on that issue, does not present an instance where the appellate court must adopt the findings of the trial judge. An anticipation must be proven by evidence so cogent as to leave no reasonable doubt in the minds of the court, and, if the evidence in support of the issue fail to measure up to that standard, the law will not uphold a conclusion that prior use has been proven. Barbed Wire Patent Cases, 143 U. S. 275, 12 S. Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona Works, 155 U. S. 286, 15 S. Ct. 118, 39 L. Ed. 153; Eibel v. Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523.

[19] If appellee's position be correct, an anomalous situation exists. In one district of the circuit the District Court has decided upon conflicting evidence that the patents were valid, because the evidence lacked that high degree of cogency necessary to sustain the defense of anticipation, while in another district of the circuit the District Court has decided that upon the same issue, and upon substantially the same evidence, supplemented by some additional testimony, the evidence was of sufficient strength to prove beyond a reasonable doubt that the devices were anticipated. Now, if on appeal this court must adhere strictly to the general rule that, where there is a substantial conflict in the evidence, it will not disturb the finding of the trial court, and it becomes unnecessary to analyze the evidence in order to determine whether or not it is of that convincing character indispensable to sustain the plea of anticipation, what will the result be? The owner of the patent finds his invention of great value in one area, but worthless perhaps only a mile or two distant, and that he has no judicial remedy as against the decree controlling within the latter area.

We cannot believe that the law falls short in providing means to correct such an absurd injustice, and it is our opinion that a proper administration of the law makes it the duty of the appellate court to review the finding, and, although presumably the trial court's finding is correct, to examine the evidence

and determine whether it is of sufficient strength to justify the conclusion of the lower court. These views are in no sense an impairment of the force of the principle which accords a presumption in favor of the findings of a trial court or jury; nor are they an obtrusion of a novel construction with respect to the obligation of the appellate court to support that principle. They are the expression of our conviction that, in cases where the application of the principle stated must result in palpable miscarriage of justice, the reviewing court has the power, and there is imposed upon it the duty, of applying the wider principle by which a plain injustice may be corrected.

[20] Defendant denies infringements, and says that Carson does not in terms call for vertical walls, and that his drawings show them. But his claim in his first patent calls for overhead receptacles so arranged that the material in the receptacles passes out into the furnace by gravity, and in his second patent he has a claim for feeding the ores into the furnace and causing the same to form a sloping embankment, resting upon the floor of the furnace chamber and along the walls within the chamber between the bath and the walls. Appellee's three types, perpendicular, 76, and 60 degree angles, are within these claims. In all of them the ore passes out into the furnace by gravity, and in each the ore forms a sloping bank resting upon the floor and against the walls. While ore is passing down the inclined walls of 76 and 60 degrees of incline is not an exact vertical movement, nevertheless the same result is attained, in that there are produced sloping embankments against the walls. Mathematical accuracy by way of precise perpendicularity is not the only form of producing the embankments. Form is not of the essence of the invention; nor is the claim limited to perpendicular walls. The essential object of accomplishment of claim 2 was the forming of the sloping embankments, and we think it follows that, inasmuch as defendant's angular walls of 76 degrees and 60 degrees produce sloping embankments, yet do not change the result, there is infringement. Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935.

[21, 22] Defendant offered exhibits to show that its furnaces are dry hearth. As we understand the evidence, the ore banks slowly melt and the product slides down the inclines. When the charge is first put in, the sloping banks on sides and bottom are formed, and the unsmelted ore meets in the middle of the furnace; but, as the smelting goes on, the ore on the bottom of the furnace melts, and thus there comes a bath over the bottom, where the charge rests. The thick material drifts on an inclined floor by slow flow; melted material flows down the sides of the banks; the bath is replenished, and a bath is always there in the smelting area. Dams will form across the hearth, with pools of slag back of the dams, often forming a mass of molten material. It is observable, too, that in defendant's drawings the whole surface of the side walls is not shown as covered by sloping banks. A portion, but not all, is covered. This being so, the uncovered or unprotected parts are subject to the injurious action of the slag and heat. Irregular charging of the material through the drop holes would produce a scorifying, where the charging did not cover the entire surface of the side walls. But, by not using Carson's invention to its full extent in protecting the side walls from heat, yet using it to a substantial extent, defendant cannot avoid infringement. Winans v. Denmead, 15 How. 344, 14 L. Ed. 717, followed in King Ax Co. v. Hubbard (C. C. A.) 97 F. 795. See, also, Penfield v. Chambers (C. C. A.) 92 F. 630, and Kawneer v. Detroit (D. C.) 240 F. 737.

It is worthy of note that Carson claimed nothing in relation to a deep bath. The bath is a mere incident of form of construction which he shows as the best form. The invention, as already said, is in the formation of sloping embankments of smelting ore which protect the side walls from the heat and the bath. He could form a hearth on an incline. What defendant was trying to do was the same thing, and to protect the walls from heat and slag by sloping embankments, which prevent the heat and bath from coming in contact with the side walls, although it did so by banks and a gentle slope of the hearth, which transferred the bath from the smelting end to the skimming end. The change in form of construction, so that the bath was transferred from one end to the other, does not avoid infringement.

[23, 24] It is said that the suit should be dismissed for lack of title in Carson, who was plaintiff in the original complaint. This suit was originally filed in the name of George Campbell Carson, patentee, although before filing the complaint he had made an assignment to John Henry Miller, trustee. Carson, however, at the time the original bill was filed, had a beneficial interest in the patents and their proceeds. After the present suit was brought, Carson assigned all of his interest in the patents and their proceeds to the Carson Investment Company, and later John Henry Miller, trustee, with the consent

of all the beneficiaries of his trust, assigned the patents and their proceeds to the corporation above named. Afterward a supplemental bill was filed by the Carson Investment Company, in which the ownership by that corporation of the patents in suit was alleged. Later, and while the suit was pending, the original and supplemental bills were amended and John Henry Miller, trustee, was brought in as a party plaintiff, and the manner in which the trustee became interested, and in which his title became vested in the corporation, was set forth.

We are satisfied that Carson was a proper party, having sufficient interest in the patents to enable him to commence the original suit. We are also of the opinion that it was proper to amend the original bill by making John Henry Miller, trustee, a coplaintiff with Carson, and that it was proper to amend by making the Carson Investment Company a party, and showing that that corporation had obtained its title through the trustee. Goodman v. Niblack, 102 U. S. 556, 26 L. Ed. 229; Illinois Surety Co. v. United States, 240 U. S. 214, 36 S. Ct. 321, 60 L. Ed. 609; McDonald v. Nebraska (C. C. A.) 101 F. 171; Carson v. A. S. & R. Co. (C. C. A.) 11 F.(2d) 764.

After careful consideration of all of the points urged, our conclusion is that the new evidence calls for no change in the decision reached in our former opinion, and that the District Court was in error in rendering a decree holding the patents invalid, and in finding no infringement and dismissing the complaint.

The decree is reversed, and the cause remanded, with directions to award injunction and proceed in the usual manner to an accounting.

Reversed and remanded.

DIETRICH, Circuit Judge (dissenting). That the Anaconda test furnace is practicable the evidence establishes beyond a reasonable doubt, and upon its structure both the Siemens and Carson patents are, in my judgment, easily read. With all deference, too much significance, I think, is attached to a single expression in the Siemens patent, suggesting a wall inclination such as will maintain the ore thereon by its own gravitation, or, as seems to be the view of the majority, the angle of repose. The angle of repose being indefinite and variable, depending upon the coarseness and angularity of the material and the manner in which it is fed to the heap, it is difficult to believe the reference to it was intended as a fixed specification for wall posture. But, of more importance, with the interpretation put upon it by the majority the statement is opposed, not only to the Siemens drawings, which exhibit walls conceded to be too steep for any possible angle of repose, but to the express language declaring that the ore from the hoppers "sinks down into the bed of the furnace, forming a sloping heap on either side, * * * the ore acted upon by the flame is fused, and the liquid ore collects in the basin formed in the middle of the furnace between the two side heaps of ore."

As I understand, the parties are in accord upon the proposition that the invention in controversy consists essentially of the conception of protecting the side walls of the furnace from erosion by a lining of the smelting ore itself, instead of one of foreign or fettling material, and the attendant conception of the means for accomplishing this end by so introducing the ore through ports along the top of the wall that by gravity it moves downwardly, forming a heap resting upon the floor of the furnace and against the side wall, the interior surface at all times corresponding measurably to the angle of repose. Carson's drawings disclose perpendicular walls, but he declines to be limited to that form of structure, and, I think, correctly, for perpendicularity is not of the essence of his claimed invention. But for like reasons no specific inclination is of the essence of Siemens' patent. The essential elements of both are the same, and when, as is true of both, the object, and the general scheme by which it is to be accomplished, are clearly described, all the rest is a mere matter of mechanical skill in practice. So I fully concur in the opinion of the lower court, where it is said:

"But grant, for the sake of argument, that Siemens' walls are too flat to accomplish what he so fully and clearly described in the patent last aforesaid and elsewhere: None the less they serve for anticipation. Why? Because any one skilled in the art, any layman reading Siemens, advised of his object, observing the failure of his process to function over such walls, would instantly appreciate the mischief and the remedy, viz. too flat walls to be raised more nearly vertical. He would indubitably comprehend that, if the ores would not descend to the hearth over Siemens' walls, they would over steeper walls. That is all Carson did, and that is merely mechanical, and not invention —is the mere 'shadow of a shade of an idea' frowned upon in Atlantic Works v. Brady, 107 U. S. 200, 2 S. Ct. 225, 27 L. Ed. 438.

At best what he did is but 'as a skilled mechanic, witnessing the performance of a machine inadequate by reason of some defect, by the application of his common knowledge and experience, perceives the reason of failure, and supplies what is obviously wanting. It is but the display of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the faculty of manipulation which results from its habitual and intelligent practice, and is in no sense the creative work of the inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward.' Hollister v. Benedict & B. Mfg. Co., 113 U. S. 73, 5 S. Ct. 717, 28 L. Ed. 901, cited in Concrete, etc., Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222."

Moreover, as I understand the operation, the course of the smelting ore in its descent into the bath and to the floor is substantially the same, whether the furnace walls be perpendicular or inclined; such course approximating the plane of the angle of repose. In the case of a perpendicular wall, the ore in the heap back of the plane of repose remains in repose, so that the real wall, down the surface of which the smelting ore reaches the floor, approximates the angle of repose. That this is true would seem to be manifest, and its concession is necessarily implied in Carson's contention that his patent covers an inclined, as well as perpendicular, wall. If the maintenance of a triangular section of the heap, bounded by a perpendicular side wall, the floor, and the plane of the angle of repose, is essential to his conception, he could not claim infringement by a furnace of the Anaconda structure, having walls inclined to 60 degrees.